413 So.2d 696 (1982)
Morris B. PHILLIPS, et al.
v.
EQUITABLE LIFE ASSURANCE COMPANY OF THE UNITED STATES, et al.
No. 12439.
Court of Appeal of Louisiana, Fourth Circuit.
April 15, 1982.
Rehearing Denied May 19, 1982.
*697 Milton E. Brener, Garon, Brener & McNeely, New Orleans, for plaintiffs-appellants.
Robert E. Peyton, Christovich & Kearney, New Orleans, for defendant-appellee.
Wilton E. Bland, III, Hebert & Abbott, New Orleans, for third party defendants-appellants.
Before GULOTTA, BYRNES and WILLIAMS, JJ.
WILLIAMS, Judge.
Plaintiffs-appellants have appealed from a decision of the trial court finding Equitable Life Assurance Society of the United States ["Equitable"] not negligent in the death of Mrs. Shirley F. Phillips. Defendant-appellant Equitable has appealed the trial judge's decision requiring it to indemnify Winn-Dixie of Louisiana, Inc. ["Winn-Dixie"] for the amount Winn-Dixie paid in settlement to the plaintiffs.
FACTS
On April 2, 1979, Mrs. Shirley F. Phillips was shot during an armed robbery attempt in the parking lot of the Winn-Dixie Food Store in the Carrollton Shopping Center in New Orleans. She died during surgery several hours later at Touro Infirmary.
Mrs. Phillips's assailant was Yule Smith. The day before the shooting he had robbed another woman in a parking lot. One-half hour after shooting Mrs. Phillips, he robbed a woman at another grocery store at gunpoint and stole her car. The next day he committed an armed robbery on the employees of a bakery store and exchanged gunfire with the police officers pursuing him after the robbery. Smith was wounded and apprehended. He was tried for the first degree murder of Mrs. Phillips and was found guilty and sentenced to life imprisonment.
Morris B. Phillips, husband of Mrs. Phillips, and Sydnee and Morris H. Phillips, children of Mrs. Phillips, filed suit against Equitable, the owner of the shopping center, and Winn-Dixie alleging that their negligence in failing to provide adequate security in the parking lot was the proximate cause of Mrs. Phillips's death.
Before trial, Winn-Dixie and the plaintiffs entered into a settlement agreement. Trial was held on October 12, 1980, and a twelve-person jury, in response to interrogatories, found neither Equitable nor Winn-Dixie negligent.
I. NEGLIGENCE
The plaintiffs have argued that Equitable, as owner of the shopping center, owed a duty to protect its patrons from crimes such as the one involved in the instant case. The plaintiffs assert that the verdict reached by the jury is manifestly erroneous and should be overturned.
At trial, extensive testimony was adduced as to the number and types of crimes occurring within the shopping center or in the area immediately adjacent to it. The plaintiffs argued that the crimes occurring in the area were of sufficient number to place Equitable on notice that a similar crime might occur in the area and to take precautions against it. The plaintiffs specifically have argued that Equitable breached its duty to Mrs. Phillips by failing to provide: (1) adequate warnings of the possible danger, i.e. criminal activity, in the area; (2) sufficient lighting; and (3) adequate security.
In Louisiana, there are few guidelines to be found in decisions involving similar facts. Nevertheless, the trial court instructed the jury that the defendant should be held to the following standard:
"An owner or occupier of land who used his property as the location for a business establishment which the public is invited to patronize owes his customers and prospective customers the duty of exercising ordinary care to maintain the premises in a reasonably safe condition. This responsibility for seeing to the safety of the premises includes an obligation to protect patrons from criminal attacks by third parties if such criminal acts under the circumstances prevailing are reasonably foreseeable."
Tr. at 554. The jury, after considering this charge and the evidence adduced at trial, *698 found that the defendant was not negligent.
It is well established that a store owner is under a duty to take reasonable care for the safety of its patrons, but is not the insurer of the patrons' safety. Roberts v. Tiny Tim Thrifty Check, 367 So.2d 64 (La.App. 4th Cir. 1979). The proprietor of a public place has a duty to protect its patrons from injuries caused by third parties when it is within his power to do so. E.g. Cooper v. Ruffino, 172 So.2d 717 (La.App. 4th Cir. 1965). This duty is not inconsistent with the standards set forth by other jurisdictions. See, e.g. Winn-Dixie v. Johnstoneaux, 395 So.2d 599 (Fla.Dist.Ct.App.3d Cir. 1981).
In Roberts v. Tiny Tim Thrifty Check, supra, the parents of a teenager, a patron who was killed during an armed robbery at a convenience store, sued the storeowner claiming that the storeowner's negligence resulted in their son's death. The court considered the following facts in finding that the defendant had not breached its duty to the decedent: (1) the defendant had hired an armed guard who travelled between the particular store in which the killing occurred and another store ten blocks away; (2) the defendant had requested the police to regularly patrol his stores, which was done; and (3) there was no evidence that there was a high possibility that the store would be robbed or that the store frequently had been robbed in the past.
In the instant case, Equitable undertook to provide security in the parking lot (Tr. at 173-92) and had signs posted in the parking lot and stores to that effect.
A. Security
Harold M. Wheelahan, Jr. was manager of the Carrollton Shopping Center for Equitable at the time of the murder. He was in charge of security for the shopping center. He testified at trial that he first hired a security guard in 1977 after consulting with most of the merchants in the area. He hired Dale Bonura, a member of the New Orleans Police Department who was responsible for hiring off-duty police officers as the security guards. The guard initially patrolled only from 5:00 p. m. until 9:00 p. m., Monday through Saturday, but the program later expanded from 10:00 a. m. until 9:00 p. m. Wheelahan testified that the change occurred after a consultation with Bonura.
When questioned about specific crimes that had been committed in the shopping center area, Wheelahan was unaware that they had been committed and admitted that there was no system for reporting all of the crimes in the shopping center.
Wheelahan testified that he had thought of hiring more than one guard but after consulting with other merchants, determined that one was sufficient. Wheelahan testified that if business were down he would consider expanding the security measures.
In the instant case, thirty-two police reports on crimes that had been committed in the immediate area were introduced into evidence. Of these crimes, twelve were burglaries of stores in the shopping center, nine were armed robberies; five were simple robberies; two were batteries; and an attempted murder, two simple batteries and a theft that arose from one incident at the Winn-Dixie. These crimes had been committed within the twelve months preceding the death of Mrs. Phillips. The shopping center in which these crimes took place is approximately seventeen and one-half acres located on both sides of a four lane street and drainage canal. There were thirty-seven stores in the shopping center in April, 1979.
At the time that the incident occurred, an off-duty member of the New Orleans Police Department was on duty patrolling the parking lot of the shopping center. Usually, this security guard patrolled the area in a small three-wheeled vehicle similar to a golf cart in which the uniformed police officer was clearly visible. On the night that the killing took place, the vehicle regularly used for patrol was being repaired and the guard was using his own, unmarked car.
The security guard was hired to patrol the parking lot area, but was inside of the *699 Western Auto Store, adjacent to the Winn-Dixie, at the time of the shooting. He was with the manager of the store, who was counting the money taken in that day. Testimony at trial revealed that although the purpose of the security guard was to patrol the parking area, Wheelahan had requested the guards to check in with the stores periodically so that the storeowners would know that they were "getting their money's worth," because the storeowners paid a percentage of the security costs.
The plaintiffs argued that the system of security utilized by Equitable was completely ineffective on the night in question in the shopping center. The plaintiffs point out that on the night in question, the policeman on duty was: (1) patrolling in an unmarked vehicle, and (2) inside of another store, at Wheelahan's direction, when the incident occurred.
The defense had two expert witnesses testify that the security as it existed on April 2, 1979 was adequate. These witnesses pointed out that there were five off-duty New Orleans Police Department officers in various stores in the shopping center, including the Winn-Dixie, and that there was an additional officer on patrol in the parking facilities. These officers had a very good communication system with one another. There were also five private security officers in the shopping center. These private security officers could communicate with each other by use of the telephone and with the patrolling officer by using a "beeper-phone". In addition, the New Orleans Police Department regularly patrolled the area. One of the experts stated that the number of crimes reported for the Carrollton Shopping Center was 27% lower than the average for similar areas. Both expert witnesses called by the defense stated that three or four patrolmen could not have prevented the crime, especially in light of the subsequent actions of Yule Smith.
B. Lighting
The plaintiffs also argue that the lighting in the area in which Mrs. Phillips was killed was not working at the time of the crime and that this failure to provide adequate lighting contributed to Smith's ability to perpetrate the crime.
It was uncontested at trial that the lighting in the section of the parking lot where Mrs. Phillips was killed was not working. The parties are in disagreement, however, as to the actual effect of the absence of lighting.
The plaintiffs questioned Wheelahan about the lighting. He stated that a photocell in the light was not working and had not been adjusted at the time. The plaintiffs introduced into evidence a marketing survey done by Gordon L. Joseph & Associates in Spring of 1978. One of the firm's recommendations on improving the center was the installation of more lighting.
Martin Venezia, a member of the New Orleans Police Department investigating the murder, testified that on the night in question the lights in the area of the parking lot where Mrs. Phillips was killed were not on and that the only light available was the light from inside of the Winn-Dixie and Western Auto stores. Venezia stated that it was difficult to describe the lighting, but felt that if he knew someone in the parking lot that he would probably recognize them, although he would have difficulty later identifying someone unknown to him.
Craig Peterson was an off-duty member of the New Orleans Police Department working as a security guard inside of the Winn-Dixie at the time of the incident. He testified that the lighting in the parking area was good and that the only reason he had not seen the crime was because of his station inside of the store, not the lighting.
Robert Boylan, a commercial photographer, took photographs of the Winn-Dixie parking lot at the request of the defense. Boylan appeared as a witness at trial, and the photographs were admitted into evidence. Boylan testified that the photographs were taken in the end of April or early May at 8:00 p. m. (rather than 7:00 p. m., when the crime occurred, because Daylight Savings Time had not been in effect at the time of the incident.) Boylan took light meter readings with the parking lot *700 lights on and off and testified that there was very little difference in the results of the readings. He stated that when the overhead lights were not visible in the photographs, it was almost impossible to tell which ones had been taken with the lights on and which ones had been taken with the lights off.
At trial, the defense also presented the testimony of Ben Z. Siegel, an expert in the field of electrical engineering. At the request of the defense, Siegel had performed a series of tests where the killing had occurred, measuring the light intensity at that location. The witness's conclusion was that there was adequate lighting available in the area in question at the time of the incident.
C. Signs
The plaintiffs have argued that Equitable was in error in not placing patrons on notice that the shopping area was potentially dangerous because of the crime that occurred in the area.
At trial, Wheelahan explained that the stores were each supplied with signs stating that the parking area was patrolled by New Orleans Police Department. Wheelahan testified that it was up to the individual merchants whether to display them, but that he had seen them on display in various stores in the shopping center and throughout the parking lot. He stated that the purpose of the signs was to let the general public know that there was a policeman patrolling the parking area.
After reviewing the evidence adduced at trial we find that the decision of the jury was not manifestly erroneous. Although had we been the triers of fact we might have reached a different conclusion, in light of the evidence we are unable to hold that the jury was so in error that its decision warrants reversal. There is evidence in the record to support a finding that the security in the parking lot was adequate in consideration of the situation as a whole and further that the crime might have occurred notwithstanding a vast increase in the security force.
Due to the very nature of this case the decision made by the jury was difficult. In view of the record, however, we are bound to affirm the decision of the jury. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
II. INDEMNITY
Both Equitable and Winn-Dixie filed Third-Party demands against one another seeking indemnification and/or contribution should they be cast in liability.
During the course of the trial, Winn-Dixie settled with the plaintiffs for $15,000.00 and did not participate in the trial. The parties agreed that the question of negligence on the part of Winn-Dixie should be included on the jury interrogatories.[1]
Winn-Dixie and Equitable stipulated that the issues raised in the Third-Party complaints were to be tried separately from the main complaint and that they were to be decided by the trial judge. The judge ruled in favor of Winn-Dixie in the amount of $15,000.00 together with interest from the date of payment of that amount to the plaintiffs, plus attorneys' fees and costs of the proceedings.
Winn-Dixie had claimed that it was entitled to indemnification based upon provisions contained in the lease agreement between the parties. The lease between Equitable and Winn-Dixie provides in pertinent part:
"... Landlord shall indemnify and save Tenant harmless from any claims or loss by reason of an accident or damage to any person or property happening on or about the streets, driveways, sidewalks and parking area of Squares 618 and 619..." (Lease at 13).
Pursuant to this provision of the lease, Winn-Dixie tendered the defense of the action to Equitable, who refused to accept the defense on the basis that it was not required by the lease to indemnify Winn-Dixie from its own negligence.
*701 Absent a specific contractual obligation, an indemnitor is not required to indemnify its indemnitee against its own negligence. See Elephant, Inc. v. Hartford Acc. & Indemn. Co., 216 So.2d 837 (La.App. 1st Cir. 1968) (contractual provision providing for indemnification for "any liability" does not require indemnification for indemnitee's own negligence.)
Because, however, the jury found Winn-Dixie not to be negligent, and we find no manifest error in that decision, the trial court was not in error in requiring Equitable to indemnify Winn-Dixie for the money paid in settlement.
For the foregoing reasons the decision of the trial court is affirmed.
AFFIRMED.
NOTES
[1] This was done so that any verdict against Equitable could be reduced by one-half should the jury find defendants jointly liable.