547 So.2d 1075 (1989)
Tammy WILLIE
v.
AMERICAN CASUALTY COMPANY, et al.
Earl L. CHAMBERS, et al.
v.
FEDERAL REALTY INVESTMENT TRUST, et al.
Nos. 88 CA 0003, 88 CA 0004.
Court of Appeal of Louisiana, First Circuit.
May 30, 1989.
Rehearing Denied August 17, 1989.
*1076 Robert Manard, III, and Joseph McKearn, New Orleans, for plaintiff-appellee, Willie.
Joseph H. Simpson, Amite, and C. John Caskey, Baton Rouge, for plaintiff, Chambers.
Stephen C. Resor, New Orleans, for defendant-appellant Mut. Fire & Marine & Inland Ins.
Kevin O'Bryon, New Orleans, for Chicago Ins. Co.
Felicien P. Lozes, New Orleans, for Federal Realty Invest. and Pa. Mfrs.
Laurence E. Larmann, Metairie, for Home Ins.
Before EDWARDS, SHORTESS and SAVOIE, JJ.
SHORTESS, Judge.
Tammy Willie brought suit against American Casualty Company, Federal Realty Investment Trust, and ISM Associates, Inc., for damages incurred as a result of a severe gunshot injury on April 21, 1984, following her abduction from the Town and Country Shopping Center (Town and Country), owned by Federal Realty Investment Trust (FRIT) and operated by ISM Associates, Inc. (ISM) which manages all FRIT's *1077 "improved real property" pursuant to a management agreement between the two entities.
An amending petition named as defendant, additionally, Joe Nathan Jackson (Jackson), presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana, for, inter alia, the abduction of and assault upon Willie. A third amending petition named as additional defendants American Casualty Company (American), Pennsylvania Manufacturers Association Insurance Company (Pennsylvania), The Mutual Fire, Marine & Inland Company (Mutual), The Home Insurance Company (Home), Chicago Insurance Company (Chicago), and Fireman's Fund Insurance Company (Fireman).
On FRIT's motion, Willie's suit was consolidated with proceedings instituted by Earl L. and Brenda Hayden Chambers (hereinafter, all reference to "plaintiffs" will include Willie and the Chambers), the parents of Van Chambers, a companion of Tammy Willie, who was abducted along with her and fatally injured at her side. The Chambers' proceedings were instituted against FRIT, ISM, Davis Johnson (manager of Town and Country), and American.
On the eve of trial, settlements were entered into among plaintiffs and the insurers American, Pennsylvania, and Home, as well as FRIT, individually.[1] A preliminary default was taken against Jackson.[2]
Counsel for Chicago and Mutual moved for a continuance, asserting that they were unprepared to present an adequate defense in the post-settlement posture of the proceedings. The motion was denied and the matter went to trial. Chicago settled during the trial.
A verdict, in the form of jury interrogatories, was returned which found that FRIT and ISM were negligent and that such negligence was the proximate cause of Willie's injuries and Chambers' death;[3] the jury additionally found that the Town and Country premises were defective and a proximate cause of Willie's injuries and Chambers' death.
In answers to interrogatories as to the amount of damages to be awarded to Willie and the Chambers, respectively, the jury was told to calculate the total damages without regard to any amounts of previous settlements which had totalled approximately $2,000,000.00 and $300,000.00. The jury awarded $300,000.00 to Willie and $30,000.00 to the Chambers. Counsel for plaintiffs immediately requested that the court poll the jury. A side bar followed, the content of which is not part of the record. A colloquy between the court and the jury foreman resulted. The foreman indicated, after the court rephrased the verdict question, that the jury's intent was that the $300,000.00 and $30,000.00 awarded be construed to mean over and above the previous settlements.[4]
Over Mutual's objection, the jury was polled, which confirmed that the awards were intended to be over and above the settlements. Willie's counsel requested that the judgment reflect these amounts as portions of the two totals and, additionally, that the judgment be against FRIT, ISM, and Mutual. Mutual objected to its inclusion in the judgment.
A judgment was signed against FRIT and ISM in solido for the Chambers in the amount of $330,000.00 and against ISM, FRIT, Mutual, and Jackson in solido for Willie in the amount of $2,223,000.00. An amended judgment revised the amount awarded to Willie to $2,523,000.00.
Mutual has appealed, assigning numerous errors which we group as follows: that the jury erred in its findings of fact; that the trial court erred in denying a continuance and in various evidentiary rulings during *1078 the course of the trial; and that the trial court erred at the close of the evidence in instructing the jury, revising the verdict and amending the judgment.
These assignments of error will be addressed in turn. At the outset we hold that the trial court was well within its discretion in denying the motion to continue. See Sparacello v. Andrews, 501 So.2d 269 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987). Mutual was a named defendant in the Willie proceedings and at no time argued to the trial court that there was a question with respect to coverage. It should have been prepared to conduct a defense.
EVIDENTIARY RULINGS
Code of Evidence article 802 provides that hearsay is not admissible except as specifically provided within the Code by other legislation. Code of Evidence article 803 catalogues the exceptions to this rule. The trial court accepted police incident reports of crimes occurring on Town and Country's premises based on the business records exception. Under the jurisprudence prior to the Code of Evidence, four factors were required of such records to be admissible under this exception:
(1) whether the person who himself made the record is unavailable for testimony, or production of said person would be a needless burden; (2) the writing is the first writing reflecting the transaction; (3) the records are identified at trial by one familiar with the bookkeeping procedure used by the business keeping the records, and (4) the evidence is reliable.
(citations omitted). American Supply Co. v. Genina Marine Services, 470 So.2d 964 (La.App. 1st Cir.1985).
Officer Olivia Ann Robinson of the Hammond Police Department testified that she collected reports from the Department's files reflecting incidents at Town and Country for the two-year period prior to April 21, 1984, and that such reports were maintained as a normal business practice. Testimony of the various authors of the reports unquestionably would have been an undue burden. Most, if not all, of these reports, however, are not the mental impressions of the authors themselves but rather that of victims or witnesses to the alleged crimes. The reports contain hearsay within hearsay. The reliability of the former is not without question. Cf. L & K Land, Inc. v. Billiot, 428 So.2d 1108, 1110 (La.App. 1st Cir.1983) (testimony of a sheriff's deputy based upon an oral report from another deputy as to the date an eviction notice was served was held to have been made during the normal operation of the sheriff's office and thus "vested with a guarantee of trustworthiness upon which that office [depended]" and therefore admissible).
Code of Evidence article 803(8) recognizes an exception to hearsay for, inter alia, "reports ... of a public office or agency setting forth ... [i]ts regularly conducted and regularly recorded activities [and] [m]atters observed pursuant to duty imposed by law...." Excluded from this exception, however, are "[i]nvestigative reports by police and other law enforcement personnel."
The reports were arguably introduced not for the veracity of the victims' or witness' statements therein but rather simply for the fact of the numbers and types of crimes being reported at Town and Country, which fact, plaintiff argues, ISM and FRIT were duty bound to know. There was no evidence whatsoever that either entity was aware of these reports, and Officer Robinson testified that the Hammond Police Department did not forward copies of the reports or any other data to either. However, we have not been presented with an instance of the introduction of the reports for the very limited purpose of showing what the operator (or owner) of Town and Country would have found had the effort been made, with an attendant instruction to disregard the hearsay statements contained within the reports. What we are presented with is the introduction of these reports under the business records exception, which we find to be error. For reasons expressed hereinafter, though, we find it harmless.
*1079 The inadmissible hearsay statements in these police reports are no more than a description of the alleged crimes. Anthony Nicholas Potter, Jr., plaintiffs' security expert, testified as to the type of criminal activity at Town and Country. The level of criminal activity was quite high. Potter conducts a security consulting business wherein he inspects shopping centers and other business establishments. Potter testified that his consulting business is approximately 75% shopping center management clientele, and that it is a standard of practice in the industry to get reports on criminal activity on shopping center premises from the local police department on a regular basis.
Potter's testimony addressed the factors that, in his opinion, determine the particular security needs of a shopping center:
A number of things, the size and configuration of the shopping center, the number of parking spaces, the tenant mix. Some types of tenants will attract more trouble, shall we say, than others. The location of the shopping center, whether or not it is accessible to public transportation, whether or not it is close to say a high school, whether or not it is close to another activity such as a premises that sells or serves alcoholic beverages that would generate security problems, whether or not there are tenants that have extended hours, such as a movie theater or food and beverage operation. The most important consideration with respect to whether or not security patrols are required is the level of criminal activity in the shopping center. That is the most relevant factor.
Potter noted the adequacy of the lighting of the parking lot as an additional factor, explaining that these factors combine to create a level of opportunity to commit crime, which is, in essence, what security measures are designed to reduce. He classified crime as that against persons and that against property, but testified that persons engaged in criminal activities were becoming increasingly more likely to commit various types of crimes. He testified that he looked at the level of crimes against persons, particularly, in forming his opinion.[5] Potter's opinion was that Town and Country's measures, particularly the lack of security personnel, were inadequate.
Code of Evidence article 703 provides that an expert may base his opinion upon facts or data not admissible in evidence if of a type reasonably relied upon by experts in the particular field. This article is not inconsistent with jurisprudence prior to the Code. State v. Fallon, 290 So.2d 273 (La. 1974). Code of Evidence article 703 is a verbatim reproduction of Federal Rule of Evidence 703. Under the federal rule, much deference is given to the expert's opinion that other experts in his field reasonably rely on the inadmissible sources of information. Greenwood Utilities Commission v. Mississippi Power Co., 751 F.2d 1484 (5th Cir.1985). The inquiry is to be made on a case-by-case basis, with its focus to be on the reliability of the opinion and its foundation. Viterbo v. Dow Chemical Co., 646 F.Supp. 1420 (E.D.Tex.1986), aff'd, 826 F.2d 420 (5th Cir.1987). We believe that it was reasonable to rely on the inadmissible reports to form an expert opinion as to the level of criminal activity at Town and Country. While every statement on every police report may well not have been true, the reported numbers and types of crimes at a location is probably the best and at a minimum a reasonable indicator of the kinds and frequency of criminal acts actually occurring.
While the reports were not admissible, Potter's testimony was. The numbers and types of crimes were therefore properly before the jury. See Code of Evidence art. 705 (providing that "an expert may testify [as to his] opinion ... and give his reasons therefore" (sic)).
In determining that the error in the admission of these reports was not harmful, *1080 we are mindful that there was other evidence before the jury as to criminal activities at Town and Country. Lynn Chasez, a former assistant manager of the Winn Dixie grocery store located in Town and Country, testified that she witnessed the abduction of one of her customers approximately a year prior to the abduction of Willie and Chambers. She additionally testified that she witnessed other crimes[6] which were not reported to the police.
Chasez testified that she often worked late hours and that she summoned police on several occasions due to the congregation of unruly "teenagers" in the parking lot harassing customers. Chasez testified that on several occasions she called police to be escorted to her own car. Chasez testified that management of Town and Country was notified of these recurrent problems.
There is, additionally, some reference to criminal activity at Town and Country in a letter written by an ISM employee, Max Sweet, to the Chief of the Hammond Police Department, requesting increased police patrols of Town and Country. This letter, as well as an internal ISM memorandum from Sweet entitled "Inspection Report" dated March 9, 1981, a memorandum entitled "Inspection Report (Supplement)" dated July 2, 1981, and a brief, untitled memorandum dated July 28, 1981, were objected to at trial on the basis of authenticity.
Plaintiffs authenticated these documents with excerpts read into the record from the depositions of Sweet and another ISM employee, Calvin Grimes.[7] The documents are on ISM letterhead. Sweet's testimony authenticated the "Inspection Report" and the "Inspection Report (Supplement)." Grimes' testimony was to the effect that he recognized certain other memoranda as being generated in the normal course of ISM business, including the brief untitled memorandum from Sweet dated July 28, 1981 (discussing the condition of the Town and Country parking lot and plans to upgrade the lighting), and the letter from Sweet to the Chief of the Hammond Police Department requesting increased police patrols. We believe that the documents were sufficiently authenticated. See Samuel Stamping and Enameling v. Monroe Furniture, 172 So. 217 (La.App. 2d Cir.1937); see also, Code of Evidence art. 901 (providing that authentication is "satisfied by evidence sufficient to support a finding that the matter ... is what its proponent claims.").
A letter from Winn Dixie management to ISM dated May 24, 1982, was additionally objected to on the basis of authenticity. The letter was properly authenticated by Lynn Chasez, who recognized the letterhead, identified the referenced store number as being that of the Town and Country Winn Dixie, and recognized that the contents correctly reflected the circumstances at the time. See Samuel Stamping, 172 So. at 217. This letter referred to criminal activities ("teenagers riding around the parking lot drinking and smoking pot, harassing ... customers after dark") at Town and Country and indicated that Winn Dixie planned to extend the store hours of the Town and Country store but that the problems with the teenagers were of some concern. All of the alleged evidentiary errors have no merit.[8]
INSTRUCTIONS TO JURY AND ITS FINDINGS OF FACT
Mutual assigns error in the trial court's instructions to the jury regarding *1081 the respective liability of FRIT as owner of Town and Country and ISM as manager. The pertinent portion of the instructions reads as follows:
An owner or occupier of land who uses the property as a location for a business establishment, which the public is invited to patronize, owes his customers and prospective customers a duty of exercising ordinary care to maintain the premises in a reasonably safe condition. This responsibility for seeing to the safety of the premises includes an obligation to protect patrons from criminal acts by third persons if such criminal acts under the circumstances prevailing are reasonably foreseeable.
In determining whether or not criminal activities were foreseeable, you are entitled to take into account whether or not there was a history of prior criminal activity in this same location. Thus, if you find from the evidence that there was a history of prior criminal activity in the Town and Country Shopping Center, you are entitled to take such fact into account in determining whether or not a particular criminal activity that is the subject of this case was reasonably foreseeable.
Under Louisiana law a shopping center owner is under a duty to take reasonable care for the safety of his patrons, but he is not the insurer of their safety. This ability to protect business patrons does not extend to the unforeseeable or unanticipated criminal acts of an independent third person.
It is a well settled principle of law that knowledge possessed by an agent is imputed to the principal even if the agent neglected to specifically convey those facts to the principal. Accordingly, should you find that any agent or employee of the defendants had knowledge of the existence of prior crimes committed in the Town and Country Shopping Center, as a matter of law, such knowledge is imputable to the defendants of which he is an employee.
Federal Realty, as the owner and custodian of its premises and specifically its parking lot lights, is responsible for any defect in its premises which plaintiffs [allege] to be the inadequate illumination of the parking lot lights. This liability under Article 2317 and 2322 of the Louisiana Civil Code attaches whether or not specific knowledge of this defect can be shown by Federal Realty so that neither its ignorance of the defect nor its latency can be used to defeat the [plaintiffs'] recovery.
This instruction is consistent with section 344 of the Restatement (Second) of Torts (1965), which provides at comment (f) as follows:
Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of the third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.
We are unable to find any Louisiana case where section 344 was specifically followed, although at least one prior jury was instructed consistent with its teaching. See Phillips v. Equitable Life Insurance Co., 413 So.2d 696, 697 (La.App. 4th Cir. 1982) (wherein the jury was instructed that an owner or occupier of land used for a business establishment owes a duty to protect its "customers and prospective customers... from criminal attacks by third parties if such criminal acts under the circumstances prevailing are reasonably foreseeable"). *1082 [9]Phillips involved a shooting in the parking lot of the Winn Dixie Food Store in Carrollton Shopping Center in New Orleans. Thirty-two police reports of criminal activities in and around the shopping center, from the twelve months preceding the shooting, were introduced into evidence. They reflected, inter alia, twelve reported burglaries, nine reported armed robberies, five reported simple robberies, two reported batteries, and one reported attempted murder. Phillips, 413 So.2d at 698. There was a security guard hired to patrol the parking area on duty at the time of the shooting, but he was in one of the other retail stores in the shopping center. Id. at 699. In addition, there were five off-duty New Orleans Police Department officers in various stores in the shopping center, including Winn Dixie, and five private security officers on duty in various locations in the shopping center. Id. Expert testimony indicated that the number of crimes reported from Carrollton Shopping Center was 27% lower than the average for similar areas. Id. The jury in Phillips found no negligence on the part of Winn Dixie and the Fourth Circuit affirmed.
In Miles v. Flor-Line Associates, 442 So.2d 584 (La.App. 1st Cir.1983), this court specifically stated that the owner or management of a business establishment has a duty to protect its patrons from the criminal acts of a third person when it has knowledge, or can be imputed with knowledge, of the third person's intended conduct. Miles, 442 So.2d at 586; see also Pennington v. Church's Fried Chicken, 393 So.2d 360 (La.App. 1st Cir.1980).
Miles involved an assault and purse snatching in the parking lot of Cortana Mall. The merchants of Cortana Mall contracted with Flor-Line for security. On the day of the incident, a weekday, there were two guards on duty. The trial court noted that Cortana Mall was well-lit and in a low crime area. A computer print-out of criminal incidents at the mall revealed "random and isolated" criminal assaults and six instances of purse snatching during the four years preceding the Miles incident. 442 So.2d at 586. The trial court held that Flor-Line did not breach a duty to plaintiffs, and in affirming that ruling, this court remarked:
From these facts alone, we are unable to say that the criminal activities at the mall were sufficient to require the posting of warning signs or an increase in the number of security guards.
Id. Implicit in this holding is that other facts could require the posting of warnings or an increase in security. We reject outright the contention that Harris v. Pizza Hut, 455 So.2d 1364 (La.1984), limits the duty to protect one's business patrons so that the duty to protect can be breached only when a business has assumed such duty. In Harris, those were simply the facts: the duty had been assumed and was negligently performed. Harris, 455 So.2d at 1364. Moreover, language in Harris indicates the contrary:
The issue of a business establishment's liability to a patron for criminal assault by a third party is discussed in Banks v. Hyatt Corporation, 722 F.2d 214 (5 Cir., 1984). Although Banks dealt with an innkeeper's liability, any business which invites the company of the public must take "reasonably necessary acts to guard against the predictable risk of assaults."

. . . .
The circumstances establish that this armed robbery was foreseeable and more than a mere possibility. The guard was there to prevent financial loss to the restaurant, assure the patrons that the premises were safe, and otherwise create what turned out to be an illusory impression of security. It is unnecessary to decide how many prior criminal acts create a duty to hire a private guard because the Pizza Hut had recognized that the risk of crime on these premises was sufficiently foreseeable to require *1083 special protection. Whether this Pizza Hut had a duty to hire security guards is irrelevant. There was a security guard.
(Citations omitted.) (Emphasis ours.) 455 So.2d at 1369, 1371.
This court has specifically recognized a duty on the part of a business to protect a patron against the criminal act of a third person in instances where the business had particular knowledge of the impending occurrence of the criminal act. See e.g., Davenport v. Nixon, 434 So.2d 1203 (La.App. 1st Cir.1983) (where a motel night clerk was aware of "suspicious activity and was asked by a guest for protection against a specific threat"); Atkins v. Frazell, 470 So.2d 505 (La.App. 1st Cir.1985) (where a manager of a lounge was asked by a waitress to summon police because one lounge patron was threatening another).
In Pennington and Miles we were presented with situations analogous to that at bar; plaintiffs therein argued not that there was (or should have been) awareness of the specific impending criminal conduct but, rather, that there was (or should have been) awareness of a pattern of conduct which made the particular injury-causing criminal conduct foreseeable. This is exactly the exception to the general rule (i.e., that there is no duty to protect against the criminal acts of third persons) recognized in the comment to Section 344 quoted hereinabove. See Restatement (Second) of Torts, § 344, comment (f). Neither in Pennington nor in Miles did we hold that no such remedy could exist; rather, we held that the facts did not support a remedy. See also Phillips, 413 So.2d at 700; Sutter v. Audubon Park Commission, 533 So.2d 1226, 1233 (La.App. 4th Cir.1988) (wherein the court found simply that there was no "significant history of violent crime" such that a duty to warn or provide security arose); Coblentz v. North Peters Parking, 533 So.2d 98, 102 (La.App. 4th Cir.1988) (wherein the court, affirming a jury verdict, held that the parking lot owner was not apprised of information "sufficient to put the lot owner on notice that someone would commit a criminal act"). The bulk of the jurisprudence from other jurisdictions recognizes the viability of a cause of action consistent with comment (f) of Section 344. See Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653 (1985); Lannon v. Taco Bell, 708 P.2d 1370 (Colo.Ct.App.1985), aff'd, 744 P.2d 43 (Colo.1987); Antrum v. Church's Fried Chicken, 40 Conn.Sup. 343, 499 A.2d 807 (1985); Winn Dixie Stores v. Johstoneaux, 395 So.2d 599 (Fla.App.1981); O'Brien v. Colonial Village, Inc., 119 Ill. App.2d 105, 255 N.E.2d 205 (1970); Parslow v. Pilgrim Parking, 5 Mass.App. 822, 362 N.E.2d 933 (1977); Faheen v. City Parking, 734 S.W.2d 270 (Mo.Ct.App.1987); Harvey v. Van Aelstyn, 211 Neb. 607, 319 N.W.2d 725 (1982); Virginia D. v. Madesco Investment, 648 S.W.2d 881 (Mo.1983); Butler v. Acme Markets, 89 N.J. 270, 445 A.2d 1141 (1982); Atamian v. Supermarkets General, 146 N.J.Super. 149, 369 A.2d 38 (Law Div.1976); Nallan v. Helmsley-Spear, Inc., 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980); Foster v. Winston-Salem Joint Venture, 303 N.C. 636, 281 S.E.2d 36 (1981); Daily v. K-Mart, 9 Ohio Misc.2d 1, 458 N.E.2d 471 (Com.Pl.1981); Brown v. J.C. Penney, 64 Or.App. 293, 667 P.2d 1047 (1983); Murphy v. Penn Fruit Co., 274 Pa.Super. 427, 418 A.2d 480 (1980); Morris v. C.C. Barnette, 553 S.W.2d 648 (Tex.Civ.App.1977); Ronk v. Parking Concepts of Texas, 711 S.W.2d 409 (Tex.Civ.App.1986); Allbright, Inc. v. Pearson, 711 S.W.2d 686 (Tex.Ct.App. 1986). Cf. Shipes v. Piggly Wiggly, 269 S.C. 479, 238 S.E.2d 167 (1977); Cornpropst v. Sloan, 528 S.W.2d 188 (Tenn. 1975).
The issue here is whether the trial court's instruction that prior criminal activity may be taken into account to determine the foreseeability of a particular criminal act was error. We think not. Implicit in the passages from Harris and Miles quoted hereinabove is that some level of criminal activity could impose a duty to post warnings or increase security because crime is foreseeable. What crime is foreseeable under what circumstances is a question of fact.
The jury here found that an abduction like that of Willie and Chambers was *1084 foreseeable. Plaintiff's security expert opined that the abduction of Willie and Chambers was foreseeable because Town and Country had no security personnel and inferior lighting, and because there was an abnormally high incidence of crimes against persons on the premises. He also testified that the kinds of businesses located in a shopping center will vary its security needs, particularly citing businesses that maintain late hours as well as businesses that sell alcohol as factors that increase a shopping center's security needs. There was evidence that there was a Pitt Grill restaurant, a movie theater and a Winn Dixie grocery store with late operating hours in this shopping center. There was evidence additionally of complaints to Town and Country management of the consumption of alcohol and illegal drugs on the premises. There was evidence from which a jury could have found that the lighting was dim in some areas of the parking lot.
Potter also testified that the level of police protection will vary the security needs. Chief Roddy Duvall of the Hammond Police Department testified that the number of personnel in his department was limited and that the cursory patrols of area shopping centers would not constitute much of a deterrent. He testified that on a busy day the Hammond Police might not patrol an area at all, and that on weekend nights his officers were preoccupied with D.W.I.'s. Duvall testified that each D.W.I. arrest required an hour and a half to two hours of an officer's time, and that in 1984 the Hammond Police Department had only two or three patrol cars on the streets at night. From Duvall's testimony a jury could easily have concluded that police surveillance at Town and Country was severely limited.
There is evidence in the record of actual notice of some criminal activity at Town and Country. Moreover, Potter testified that standard industry practice included affirmative efforts to ascertain what kind of criminal incidents are occurring at one's business premises. He testified that shopping center management personnel commonly receive copies of reported crimes on shopping center premises from local police.
Officer Robinson testified that to her knowledge neither ISM nor FRIT received any reports from the Hammond Police Department regarding reported crimes at Town and Country. There is no evidence in this record that either FRIT or ISM was aware of the level of reported criminal activity; however, Potter testified that common industry practice is to be aware, and he testified as to what would have been found had the effort been made.
Potter testified that a standard industry practice was to include security costs as a "common area maintenance" cost, which is assumed by the management of a shopping center and passed on to the individual merchants through the provisions of their respective leases. A standard FRIT lease form was introduced into evidence, authenticated with an excerpt of the deposition testimony of FRIT's general counsel, Catherine Mack.[10] The excerpt of Mack's testimony indicates that this was the standard lease form for FRIT properties in 1984. Article Five of the lease, entitled "Common Area Maintenance," required tenants to share on a proportionate basis the "gross cost of operating and maintaining the common areas...." Included in this "gross cost" was "the cost of personnel to direct parking and to provide security for the common areas and facilities."
A letter to ISM from several of the Town and Country merchants was introduced into evidence which suggests the need for a security guard.[11]
We believe that it is of no moment that Willie and Chambers were not on Town & Country premises to patronize one of its businesses. The status of an individual *1085 injured on someone else's property has long been held not determinative of the duty owed that individual. Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976). Moreover, in these circumstances it would be egregiously arbitrary to hold that because these two young people had gotten off to a late start on the evening of this tragic event, and were unable to attend the movie as planned, that the duty owed them was something less than that had they attended the movie. It is because a shopping center like Town & Country is open to the public, without inquiry into the particular business concerns of persons entering the premises, that the duty to protect members of the public entering the premises, as recognized herein, is imposed.
Mutual assigns as error the jury's finding that FRIT and ISM were negligent, that such negligence was a proximate cause of plaintiffs' damages, that Town and Country was defective, and that such defect, likewise, was a proximate cause of plaintiffs' damages.
Implicit in the jury's findings is that the abduction of Willie and Chambers was foreseeable. The jury was instructed that prior criminal activity could be considered in determining foreseeability. The only evidence from which the jury could have found that the abduction was foreseeable was the testimony regarding previous criminal activities. The jury found, therefore, that there was a duty to provide security because criminal activity against persons was foreseeable and that the duty was breached. We see no clear error in this finding. The jury also found that the premises were defective due to this negligence. A defective thing can result from the negligence of its owner or custodian. See Sullivan v. Gulf States Utilities, 382 So.2d 184, 188 (La.App. 1st Cir.1980). We see no clear error here either.
The jury found that the defective condition of Town and Country and the negligence of FRIT and ISM was a cause-in-fact of the abduction. The jury was instructed as follows as to causation:
As to the requirement that plaintiff's injury be caused by the defendant's conduct, I do not mean that the law recognizes only one cause of any injury, consisting of only one factor or thing, or the conduct of only one person. On the contrary, many factors or things may operate at the same time, either independently or together, to cause injury or damage. You should resolve this question by deciding whether plaintiff would probably not have suffered the claimed injuries in the absence of defendant's conduct. If plaintiff probably would have suffered those injuries regardless of what defendant did, then you must conclude that the injuries were not caused by the defendant, and render a verdict for that defendant. If, on the other hand, plaintiff probably would not have suffered the claimed injuries in the absence of defendant's conduct, then you must conclude that defendant's conduct did play a part in plaintiff's injury and you must proceed to the next element.
Causation here is somewhat more problematic because this cause of action is an exception to the general rule that an intervening criminal act breaks the chain of causation. See generally Annotation: "Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person," 10 A.L.R.3d 619, 648-53; Atamian, 369 A.2d at 43.
It has been suggested, however, that the questions of causation and foreseeability are inextricably entwined, and that where the criminal act is foreseeable, the failure to take reasonable steps to prevent such act is a proximate cause of its result. 10 A.L.R.3d at 648; see also, Madesco Investment, 648 S.W.2d at 889 ("[a]ll we need say is that the jury might have concluded that precautions were available which might have increased the chances of dissuading the attacker.... The plaintiff is not obliged to prove the utilization of security measures would surely have prevented the assault."); Atamian, 369 A.2d at 43 ("[s]ince additional criminal attacks should have been anticipated, it is not unreasonable to infer that reasonable security measures *1086 would have served as a deterrent and that defendants' failure to take such [measures] constituted a substantial factor in the assault...."); Orlando Executive Park v. P.D.R., 402 So.2d 442, 448 (Fla. Dist.Ct.App.1981) ("[c]ausation, like any other element of plaintiff's case, need not be demonstrated by conclusive proof," citing Prosser, Law of Torts, § 41 at 242 (4th Ed.1977)).
We believe that this approach is consistent with the cause-in-fact inquiry under our duty-risk analysis of delictual liability. See Harris v. Pizza Hut, 455 So.2d at 1371 (where the intentional act of the shooting was held not to break the cause-in-fact chain between the negligence of the security guard and the injury of the bystanders).
The jury found that the negligence of FRIT and ISM and the defective condition of Town and Country were a cause of plaintiffs' damages. We give great deference, as we must, to this finding. Harris, 455 So.2d at 1370. We see no clear error. POST-VERDICT ASSIGNMENTS
Mutual assigns as error the polling of the jury and subsequent reformation of the verdict, citing to us Robles v. Exxon, 862 F.2d 1201 (5th Cir.1989). In Robles, the jury returned a verdict apportioning fault 51% to plaintiff and 49% to defendant. The court received the verdict and commented that plaintiff would recover nothing. 862 F.2d at 1203. Thereafter, the jury foreman indicated that there had been a "misunderstanding" regarding the court's instructions on the effect of apportionment of more than 50% to plaintiff. Id. The court elicted unsworn testimony from the jurors regarding the misunderstanding and then ordered the jury to resume deliberations. The Fifth Circuit reversed, holding that Rule 58(2) of the Federal Rules of Civil Procedure and the seventh amendment require the entry of a judgment when the jury's answers to the verdict are "clear and consistent." 862 F.2d at 1204.
Pretermitting any questions as to the applicability of a case decided by a federal court under its rules of civil procedure, we believe the facts of Robles are inapposite to those at bar. The jury in Robles misunder stood the effect of its answers to the interrogatories, while the jury in the instant case misunderstood the interrogatories. The jury's answers to the interrogatories reflected this misunderstanding because, as the trial court was well aware, they were informed as to the approximate amounts of the settlements, which amounts exceeded five-fold their award to Willie and equalled ten-fold their award to the Chambers. We observe that Mutual's closing argument included statements to the effect that whatever this jury decided, Willie would get over $2,000,000.00 and the Chambers would get $300,000.00. Additionally we note that the parenthetical instruction on the verdict form which read "[d]o not deduct any amounts or percentages for previous settlements," was not explained in the court's instructions to the jury. While this language may well be understandable to lawyers and judges, it was clearly not understood by this jury.
The better course for the trial court to have taken would have been additional instruction and a return to the jury room for further deliberation; however, we do not believe the polling of the jury and the reform of the verdict consistent therewith was an abuse of discretion. See McCarter v. Liberty Mutual, 436 So.2d 726 (La.App. 4th Cir.), writ denied, 440 So.2d 145 (1983).
The subsequent reformation of the judgment to reflect the proper calculation was not error. LSA-C.C.P. art. 1951(2).
ADMISSION OF POLICY
Mutual assigns error in the admission of an uncertified and allegedly incomplete copy of its policy. The document introduced shows FRIT as the named insured. The document was authenticated at trial with an excerpt from FRIT general counsel Catherine Mack's deposition. The copy was produced at Mack's deposition. We believe there is no genuine question as to its authenticity because it was produced by FRIT, Mutual's insured. Mutual at no time argued that the policy introduced into evidence did not conform to the original except in its incompleteness. The document that was admitted showed the existence of insurance coverage. In order for *1087 any missing portion to affect the coverage, the missing portion would have to include an applicable exclusion. Mutual's answers to the first and supplemental petitions do not include an affirmative defense based upon an exclusion in the policy. Reliance upon an exclusion in an insurance contract is an affirmative defense which, if not specially pleaded, is barred. Nippert v. Baton Rouge Railcar Services, 526 So.2d 824, 828 (La.App. 1st Cir.1988). We therefore see no error in the admission of the policy.
For the reasons set forth, the judgment of the trial court as to plaintiffs is affirmed at Mutual's costs.
AFFIRMED.
SAVOIE, J., concurs in the result only.
NOTES
[1] FRIT was not released, however, to the extent that other insurance coverage existed.
[2] Only Willie brought suit against Jackson.
[3] The issue of negligence of Joe Nathan Jackson was not put to the jury. The verdict form read, in part:

"WE THE JURY FIND AS FOLLOWS:
Joe Nathan Jackson was negligent."
[4] The jury was told in closing arguments the approximate totals of the respective settlements.
[5] Potter included purse snatching, a crime not necessarily considered "violent," in crimes against persons. From a total of 120 incident reports gathered by Robinson, Potter assembled 20 incidents which he felt fell into the violent crime category and ranged from rape to purse snatching.
[6] One of the other crimes witnessed by Chasez was a purse snatching and, another, the pursuit of a shoplifter who escaped after he drew a knife on his pursuer.
[7] These documents were exhibits to one or both of the depositions. These depositions were not introduced into evidence. There was, however, no hearsay objection to the testimony excerpted. We note that it appears from the record that Mr. Sweet was no longer an ISM employee at the time of trial.
[8] This case was tried in June, 1987, and before the Code of Evidence became law. Our references to the Code are for persuasive purposes only. Our treatment of all these evidentiary assignments of error has been in accordance with our appreciation of the jurisprudence in effect at the time of trial. However, we note that in our opinion there is nothing inconsistent with the new Code and existing jurisprudence in the areas discussed.
[9] See also Smith v. Walgreens, 542 So.2d 766, 768 (La.App. 4th Cir.1989), (reversing a summary judgment for defendants on the basis of outstanding questions of material fact with regard to the foreseeability of criminal attack and abduction of plaintiff, noting that the number of previous such incidents determine foreseeability).
[10] The introduction of this exhibit was objected to at trial but has not been assigned as error.
[11] The letter, addressed to ISM Associates, and to the attention of Max [Sweet], reads, in pertinent part:

"Listed below are the items we feel need your immediate attention ... Control of the teenage problem on Friday nights and Saturday nights (perhaps a private security guard)...."