WICKER, Judge.
Thuan Ngoc Do, the plaintiff in this personal injury suit, appeals the dismissal of his claims against the defendants, Phuong Hoang Ngo and Hien Thi Dinh. The sole issue is the liability of the operators of a nightclub/lounge for intentional injury to a guest inflicted by another guest. We affirm.
Ngo and Dinh were members or managers of an informal association known as the Vietnamese Airborne Group (V.A.G.), composed mostly of people who had been acquainted in Vietnam. This association used the Queen Bee, a night club/lounge, for a fund-raising party which was open to the public. It hired a band for listening and dancing, and admission tickets and beer were sold. Dinh owned the building the Queen Bee was in, and Ngo owned some of the equipment. Dinh’s brother, Loan Dinh, also owned some of the equipment and leased the premises from Dinh.
The night of the party, Dinh hired security guards. After the band had finished playing and the general public had gone home, either Dinh or someone in the V.A.G. discharged the security guards. Only the band, the association members, and friends remained, including Thuyen Cao and Do. There were a total of fifteen to fifty people remaining, depending on whose testimony is believed, all of whom knew each other. They sat around talking to each other and eating.
Do was talking to a band member when Cao, accompanied by two other men, walked over and put his arm around Do. There was an exchange of words, apparently without anger; and Cao pulled a gun out of his jacket and shot Do in the chest. Cao *1214 then put his gun back in his jacket, and he and his friends left the Queen Bee.
Do, now a permanent paraplegic as a result of the bullet’s severing his spine, sued Dinh and Ngo, on the theory that they failed to take steps to protect their patrons and provide a reasonably safe place of business. The judge ruled against Do, finding that
the defendants did not breach their duty of care to plaintiff when they permitted the security guards to leave. The owners had no reason to anticipate that any harm would come to the persons remaining on the premises. Under the facts of the case, there was nothing that occurred prior to or immediately preceding this incident which made this particular injury-causing criminal conduct foreseeable.
In order to prevail, Do must prove three things: (1) Ngo and/or Dinh’s failure to have the security guards stay after the band had stopped playing and the general public had left was a cause-in-fact of Cao’s shooting him, (2) Ngo and/or Dinh had a duty to protect Do from being shot by Cao under these circumstances, and (3) Ngo and/or Dinh breached that duty. See Molbert v. Toepfer, 550 So.2d 183 (La.1989). Based upon the jurisprudence and the evidence, we conclude that the judge was correct in dismissing Do’s suit.
The leading case outlining the duty of a business proprietor to a customer is Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). The plaintiffs were customers at the Pizza Hut; and the off-duty policeman hired by the restaurant was seated inside, eating and talking, when two or three armed robbers entered. The time, about 9:00 P.M., was shown by statistical evidence to be the point of highest risk of crime. The lead robber, armed with a shotgun, saw the guard, who had moved toward his gun; and he shot in the direction of the guard, killing one and wounding the other of the plaintiffs. The Court held that a business proprietor has a duty to provide a reasonably safe place of business and to protect patrons from reasonably foreseeable violence.
This Court has also considered the duty of a proprietor to his patron in Toups v. Hawkins, 518 So.2d 1077 (La.App.1987). The plaintiff in that case, a nightclub patron, sued the nightclub owner for injuries incurred during a shooting at the nightclub. In ruling on a summary judgment in favor of the proprietor, we held:
A business proprietor owes to his patrons the duty to provide a reasonably safe place .... Although he is not the insurer of his patrons or guests, the proprietor owes them a duty to exercise reasonable care to protect them in both their person and their property.... He must maintain his premises free from unreasonable risks of harm or warn patrons of known dangers thereon.... Beyond these measures, the proprietor must exercise reasonable care to protect his guests from harm at the hands of an employee, another guest, or a third party.... As to criminal acts performed by third parties specifically, there is, generally, no duty to protect others from the criminal acts of those parties.... That is, the general duty of reasonable care does not extend to protecting patrons from the unanticipated criminal acts of third parties_ Only when the proprietor has knowledge of, or can be imputed with knowledge of, the third party’s intended conduct is the duty to protect invoked_ Finally, notwithstanding the general absence of any duty to protect against third-party criminal acts, an obligation to protect, once voluntarily assumed by the business owner or manager, must be performed with due care.... Whether violence that results from the breach of an assumed duty of protection was reasonably foreseeable and is cause-in-fact of an injury is a factual inquiry....
At 1081-82 (citations omitted) (some emphasis added). See also Willie v. American Cas. Co., 547 So.2d 1075 (La.App. 1st Cir.1989), writ granted on other grounds 553 So.2d 467 (La.1989); Sutter v. Audubon Park Com’n, 533 So.2d 1226 (La.App. 4th Cir.1988), writ denied 538 So.2d 597 (La.1989).
*1215 Hang Do, Do’s eighteen-year-old daughter, testified that her father was in the business of promoting bands and in competition with the Queen Bee. Do told her that, the evening of the shooting, he was talking with the band’s singer and Cao asked him to have a drink with him. Do couldn’t have a drink, however, since he had just undergone surgery. Do told her that he and Cao argued about Do’s partner, Tao Soa, and that Do defended Soa, at which point Cao took out a gun and shot him. Do knew Cao but he wasn’t a close friend.
Do, testifying through an interpreter, said he made his living organizing music. The evening of the shooting, he came to the Queen Bee about 11:00 P.M. to distribute advertising and meet the band; and he sat with the band and didn’t drink because of his recent surgery. Do saw Cao sitting with friends and drinking beer at another table. He had known Cao previously because Cao organized music also and came to his house once. They were acquaintances and had no previous arguments. Shortly after his arrival, Cao asked him to have a beer with him.
Do testified that when the band stopped playing, the crowd, which had been three or four hundred people, dwindled. Only twenty or thirty people remained; and some of them, especially the band, were eating. Cao, smelling of beer, came up to him about 2:00 A.M. and patted him on the back, telling him that he wanted to talk. Do and Cao then moved closer to the bar. When Cao approached him, “He told me that he loved my children very much and he didn’t want me to have anything to do with Mr. Soa [Tao Soa, Do’s partner].” Cao considered himself Do’s friend and didn’t want him associating with Soa. Do, however, told Cao he was going to remain partners with Soa; but Cao didn’t agree and they had an argument. Cao did not threaten him during the conversation. Cao then took out his gun or something very hard and hit him in the temple, causing him to fall down. When he tried to rise, Cao shot him.
Do also testified that Cao had called him from jail since the shooting, but he told Cao “just go to court” if he wanted anything.
Cuong Guyen, a restaurant owner and acquaintance of Do, testified that Do had a reputation somewhere between that of a peaceful man and a troublemaker, but he generally got along well with people. Do and Ngo were in the same combat group in Vietnam and they, along with others, formed the V.A.G. These were people who knew each other before [in Vietnam] and continued to see each other. The group has no officers, but someone may be temporarily in charge to contact people. The V.A.G. put on this concert on the night of the shooting to raise money for the organization.
Guyen added that he came to the Queen Bee that night around 8:30 or 9:00 P.M. There were about three or four hundred people there dancing and listening to music; it was like a concert. The band stopped playing around midnight or 1:00 A.M., and the people cleared out within a half hour. When the people left, the security guards left. At that point, only fifteen or twenty people remained, including four or five band members, Ngo and Dinh, Do, Guyen, and Cao and his two friends. Guy-en knew everyone remaining except the band.
Then, according to Guyen, Cao and his friends stood up and walked toward Do; and “they talked small, just like two friends talking.” Guyen couldn’t hear what they were saying, however. He looked away, but then he saw people out of the corner of his eye getting out of the way. Then he heard a gunshot, saw Do fall, and saw Cao put his gun in his coat and walk out with his two friends.
Hien T. Dinh, the owner of the building testified that Ngo was the proprietor of several businesses in this strip: a pawn shop, a tire repair shop, a grocery, and a gas station. She collected the rent for the Queen Bee.
The V.A.G., of which she was a member, sometimes had meetings at the Queen Bee. She helped the V.A.G. and rented the Queen Bee to it the night of the shooting. *1216 She informed the group that it had to hire security guards if it planned to have a band. There had been fights in the Queen Bee about once a month, but this was with a prior lessee. She arranged for the security guards the night of the shooting, although the V.A.G. gave her the money to pay them. There were five guards hired.
Dinh testified that she knew Do previously from when he came to play cards at her mother’s house. She had sometimes seen Cao in the Queen Bee but didn’t know him.
Both Dinh and Ngo were present at the Queen Bee the night of the shooting. The event was open to the public, with people paying admission and for drinks. She arrived about 10:00 P.M., and Ngo was already there. She sat with friends.
The security guards left around 1:30 or 2:00 A.M.: “after the band over everybody left so the security guards left.” The general public had left by the time of the shooting, and there were about twenty left. [In her deposition, Dinh testified that about fifty people were left.] Only the band, the V.A.G., and family and friends remained. She sat down to talk about the band and eat. She was sitting close to the bar and saw Cao walk up to Do, put his arm around him, and say, “I heard somebody say you want to kill me.” Then Do laughed and said, “You say that again.” [Dinh had previously told police that she saw Cao push Do and ask him if he wanted to fight before Cao shot him. Do asked Cao, “You want to kill me, but this time I tell you want to fight. Instead of fight kill me.” Dinh explained the discrepancy by stating that she was nervous when she talked to the police.] Then she saw Cao pull out a gun and shoot Do.
Between forty-five minutes and an hour after the public left, the shooting took place, according to Dinh. Prior to the shooting, nobody said or did anything that indicated there was going to be trouble. Dinh knew Cao and had no reason to suspect he was going to shoot Do.
Ngo Hoang Phuong testified through an interpreter that he opened the Queen Bee about 2:00 P.M. the day of the shooting so the V.A.G. could get in to set up. He hooked up the sound equipment for the band. He saw Cao having beer with friends, whose faces but not names he knew. Later, he remained sitting with the V.A.G. until the Queen Bee closed. Then he heard a shot and saw Do fall. Cao was holding a gun and ran out of the door.
Wayne D. Schindler testified as an expert in security. Basing his opinion on his belief that there were fifty people left in the Queen Bee at the time of the shooting, he stated that the owners and/or managers of the Queen Bee were negligent or at fault. “They assumed the risk to identify the fact that there was a need for it [security].” He felt that Dinh’s statement that there was a fight every month was an acknowledgement of violent behavior at the Queen Bee. He looked at crime statistics from the sheriff’s office showing a significant number of person-to-person, potentially violent crimes between January 1987 and July 24, 1988. He believed “there was a problem there and they needed security.” Based upon his past experience in New Orleans, violent crime happens after an event, not during, such as when people are leaving the Superdome. The fact that alcohol was served and it was late at night makes this a high-risk situation. Somebody should have assumed responsibility for security. As long as the Queen Bee was open and serving alcohol, even if only fifteen or twenty people remained, there should have been security.
Toan Dinh, the owner of the Queen Bee and Hien Dinh’s brother, testified that the Queen Bee was only open on Friday and Saturday nights and sold only beer. Generally, after the band had finished, he would ask the security guards to leave; and only the band members and a few friends would stay to eat. He never had any problems with violence after the security guards left and he had never had to call the police to handle a disturbance.
We believe this testimony supports the conclusion that, by the time of the shooting, the crowd had dwindled to between fifteen and forty or fifty people, almost all of whom knew each other or were related *1217 to each other. This was much more like a private party than a public event. There was uncontradicted testimony that there was nothing to indicate the possibility of trouble. We conclude that the shooting was not reasonably foreseeable, that the departure of the security guards prior to the shooting but after the departure of the general public did not create an unreasonable risk of harm, and that Dinh and Ngo provided a reasonably safe place for the group of people who remained after the band went home.
We affirm the judgment in favor of Phuong Hoang Ngo and Hien Thi Dinh dismissing Thuan Ngoc Do’s suit against them. Thuan Ngoc Do must pay the cost of this appeal.
AFFIRMED.