611 So.2d 174 (1992)
J. Houlberg HANEWINCKEL and Ernest Hanewinckel
v.
ST. PAUL'S PROPERTY & LIABILITY INSURANCE, CO., et al.
No. 92-CA-613.
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 1992.
Writ Denied March 12, 1993.
*175 George C. Stringer, Jr., Harahan, for plaintiff-appellee.
Thomas E. Loehn, Benjamin R. Slater, Jr., Gerard A. Bos, New Orleans, for defendant-appellant.
Before GAUDIN, DUFRESNE and GOTHARD, JJ.
DUFRESNE, Judge.
This is an appeal by Alton Ochsner Medical Foundation (AOMF), defendant-appellant, from a judgment in favor of Jacobine Hanewinckel, plaintiff-appellee, for damages suffered by her when she was attacked and beaten during an attempted rape in defendant's parking lot. For the following reasons, we affirm.
The basic facts are these. On February 4, 1988, Mrs. Hanewinckle, a 52 year old nurse-anesthetist, arrived for work at the Ochsner medical complex at about 5:25 *176 A.M. She drove into the parking lot and proceeded to back into a parking space. Before she could stop her motor, a man about 30 years old, of medium height and weight, and wearing a blue plaid shirt, opened the driver's door, pushed her over in the seat, and got behind the wheel. As he started to drive off, plaintiff asked what he was doing and he told her he intended to rape her. She jumped out of the passenger door, falling to her knees on the asphalt. Before she could escape further, however, her assailant got out of the car, grabbed her and began striking her in the head and face. She continued to struggle as he dragged and pulled her toward the nearby River Road and the levee beyond. At this time another hospital employee drove into the parking lot, saw what was happening, and immediately notified the hospital security. Three security employees went to the parking lot and found plaintiff's car with the motor running and the lights on, but because of a heavy fog, they did not immediately see plaintiff and her attacker, who by then were apparently crossing River Road and moving up the levee. After a short search security finally saw them on the top of the levee, and plaintiff was rescued. The assailant managed to escape on foot and has never been caught.
During the course of this attack, which lasted some twenty minutes, plaintiff was pulled and dragged over 500 feet while being repeatedly struck. The force of these blows was such that her left wrist was broken, some twelve teeth were knocked out or broken, her face was severely battered and bruised, and she had numerous cuts and abrasions on her legs and knees. It was further shown at trial that the wrist injury had left her with an 18% disability rating, and that she additionally had suffered serious mental trauma from which she has not yet recovered.
She brought the present delictual action against AOMF, the owner of the parking lot and provider of the security force at the medical complex, alleging that it had breached its duty of protecting her from criminal attack on its premises. After a bench trial, the trier of fact found that the defendant had a duty to provide reasonable and adequate security in the parking area, that it had breached this duty in not providing such security, and that as a result plaintiff was injured. He fixed total damages at $733,000, of which $460,000 was awarded for pain and suffering.
AOMF now appeals and urges five errors:
1. Plaintiff's sole remedy lies in the workman's compensation laws;
2. As lessor of parking spaces, AOMF cannot be liable for acts of third parties illegally on the premises;
3. Improper legal standards were applied to AOMF;
4. Plaintiff failed to prove her case by a preponderance of the evidence; and
5. The award of damages is excessive.
Because the first two asserted errors involve common facts concerning the institutional structure of the medical center, they are considered together here. The defendant, AOMF, is a non-profit Louisiana corporation which owns and operates a 20 acre medical complex in Jefferson Parish. The major components of the complex are the Ochsner Foundation Hospital, the Brent House (a hotel for recovering patients and their families) and the Ochsner Clinic. The Ochsner Clinic is, however, a completely separate for-profit partnership of physicians, which leases a building from AOMF where out-patients are treated. The doctors in this group also make up the physicians corps at the hospital. All parking lots on the campus are owned by AOMF, and it also provides the security for these areas. The employees of the other entities park in these lots and AOMF is paid a fee for this service by these entities under a written "memorandum of parking cost division" agreement. It further appears that parking Lot A, where the attack began, was open to the public, being unfenced and without any entry gates. Finally, Mrs. Hanewinckel was a long-time employee of the for-profit Ochsner Clinic at the time of the incident.
The defendant urges here, as it did in the district court, that the Ochsner medical complex is in reality a single health care *177 research and treatment center, albeit comprised of several discrete entities. Its technical legal position is that the entities are in fact engaged in a joint venture, and therefore all of them enjoy immunity from suits in tort by any employee of any of the other joint ventures, citing Latiolais v. B.F.I. of Louisiana, Inc., 567 So.2d 1159 (La.App. 3rd Cir.1990). While we have serious reservations about defendant's argument that it is a joint venturer, particularly in regard to sharing of profits and losses, see Latiolais, supra, we pretermit this question because its resolution is not required here. We, like the district judge, conclude instead that resolution of the tort immunity question is controlled by the rule set forth in Mundy v. Dept. of Health and Human Resources, 593 So.2d 346 (La.1992). The facts there were that while reporting for work plaintiff was attacked in a hospital elevator. The attack occurred before the employee had reached her work station, and was unrelated to any of her job duties. Further, the elevator was accessible to the public. In rejecting the workman's compensation immunity defense, the court noted that the attack clearly did not arise out of plaintiff's employment duties, and that she had not yet reported for work. The court further emphasized that because the incident occurred in an elevator accessible to the public, any member of the public could just as easily have been the victim, and there was thus no relationship between the job and the injury. In the present case, plaintiff had not yet reported to work, the attack was unrelated to the work, and it took place in an area accessible to the public. Given these facts, we are unable to distinguish this case from Mundy, supra, and we must therefore rule that AOMF is not entitled tort immunity under the workman's compensation laws.
AOMF's second argument, that as lessor it is not liable to its lessee for acts of third persons, pursuant to La.Civ.Code art. 2703, is equally without merit. Defendant acknowledges that the lessor can warrant that the premises are safe, thus exposing itself to such liability, citing Thompson v. Cane Gardens Apts., 442 So.2d 1296 (La. App. 3rd Cir.1983). It denies, however, that any such warranty was given here. We disagree. AOMF undertook to maintain the security force in the parking areas. Implicit in this undertaking was the warranty that this work would be carried out in a non-negligent manner. In this circumstance, the protection afforded the lessor by article 2703, against liability for acts of third persons is not available to AOMF.
The third and fourth alleged errors are the crux of this appeal. The issues raised there are first, whether there was a legal duty to protect plaintiff from the harm that befell her, and second, whether there had indeed been a breach of that duty which resulted in the harm.
Although the appellant attempts to show that this case involves novel legal principles concerning strict liability of businesses for the criminal acts of third persons, we deem this a mis-characterization of the matter. Instead, it is simply a suit for negligence involving essential facts almost identical to those presented in Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). There, Pizza Hut had hired a security guard for one of its outlets. During an armed robbery one patron was killed and another injured. A jury determined that the guard had been negligent in his duty to protect customers and that breach of this duty caused damages to them. In affirming the jury our supreme court applied the standard duty-risk analysis to determine liability in tort claims, and re-iterated the elements of that analysis as follows:
The pertinent inquiries are:
I. Whether the conduct of which plaintiff complains was a cause-in-fact of the harm;
II. Whether there was a duty on the part of the defendant which was imposed to protect against the risk involved;
III. Whether there was a breach of that duty; and
IV. Damages. (at 1370)
In the present case, the first inquiry is whether any act or omission on the part of the security force was a cause-in-fact of *178 plaintiff's injuries. The trier of fact determined, at least implicitly, that the assailant had been seen by others in or near the parking lot since about 12:30 A.M. on the morning of the attack, but had never been seen by any security employee until the end of the attack. He further found that reasonable security measures require continuous, random patrolling, but that the security force had too few people on duty, and those present had too many other duties, to patrol properly. His evident conclusion as to causation was thus that proper patrolling of the lots would have led to early discovery of the perpetrator and prevention of the attack.
These findings were based on the following evidence. At about 12:30 A.M., Father Carroll Heffner, a hospital chaplain, saw in the parking lot a man fitting the description of the assailant and wearing a blue plaid shirt. The chaplain noted that the man caught his attention because he seemed to be yelling to someone in the parking lot who was not visible. No report of this sighting was made to security, however. The next sighting of the man in the "blue plaid" shirt was made by Norissa Causey, another hospital employee, at about 5:15 A.M. She had been dropped off by a friend and as she approached the employees' entrance, the man asked her for a cigarette. She reported this encounter to Sheila Brown, the dispatcher in the nearby control room, who in turn sent another security person to the lot. The man was not seen. At about 5:20, Charlotte Ruiz, another employee was parking her car, when a man in a plaid shirt knocked on her passenger window and may have been trying to open the locked door and get into the car. After a brief period, he disappeared, and Mrs. Ruiz walked into the hospital without incident. She did not report the man to security. The next two sightings were by plaintiff at about 5:25, and then by Mrs. Juanita Detillier, who came upon the struggle at about 5:35, and reported it to security. Security thereupon sent people into the lot, but because of the fog they did not discover plaintiff and the attacker until several minutes later, and then not in the parking lot, but several hundred feet away on the top of the levee.
Other evidence showed that the "security" force on duty at the time of the attack consisted of five or perhaps six people. However, one of these, Deputy Harley Roberts, apparently left duty at about 5:30, and never appeared in the parking lot either before or after the incident. Roy Jacobs, the shift supervisor, was walking through the hospital building and unlocking various doors for the incoming staff, as he usually did between 5:00 and 5:30. One guard was on motorized patrol in front of the hospital and another was off the campus entirely at a satellite parking lot unlocking the gates. Sheila Brown, yet another guard, was manning the security office, and the sixth security employee, George White, was actually a locksmith. It was also shown that White and Emory Hunt, a shuttle bus driver, were in the security office, beginning at about 5:00 A.M. It was also White and Hunt who first responded to Ms. Detillier's report of the attack and immediately began searching the lot. Brown notified Jacobs by radio and he soon joined the other two men. Eventually, plaintiff was found, but not before she had been severely beaten. There was additional testimony from plaintiff's expert in security operations to the effect that the security force was inadequate in numbers to properly patrol the various lots, and further that the few people on duty had additional non-security duties which further watered down their effectiveness.
Based on all of this evidence, the trier of fact reached the factual conclusion that the failure of security to discover the assailant during the course of several hours, but particularly after Ms. Causey had brought him to their attention, was the cause of plaintiff's injuries. This being a factual finding, we are required to give it great deference, and could only disturb it were we to find it manifestly erroneous. Harris v. Pizza Hut of La., supra. Considering all of the above evidence we discern no manifest error, and therefore affirm the finding of causation.
*179 The next issues are whether the defendant had a duty to protect plaintiff from the criminal acts of the assailant, and whether it breached that duty. Again, the applicable law is set forth in Harris v. Pizza Hut of La., supra, "where a duty to protect others against [third-party] criminal misconduct has been assumed, liability may be created by a negligent breach of that duty" (at 1371). The court went on to explain that any inquiry as to the number of prior crimes which might create a duty on the part of a business to hire security guards becomes irrelevant once guards are actually hired. It also noted that once the guard was in place, the "question is whether the security guard breached his duty by adequate measures to protect those on the premises." (id.)
In the present matter, there is no question but that AOMF hired a security force, at least one purpose of which was to protect everyone coming onto the medical complex campus from criminal attacks in the parking lots. Clearly then, the duty was assumed, and the final issue in this regard is thus, whether there was some negligent or blameworthy breach of this duty. Once more, the analysis in Harris v. Pizza Hut of La., supra, is pertinent as follows:
The answer to [the question of breach of duty] is intertwined in the consideration of causation. Where a duty has been assumed to provide a security guard, it is necessary to decide whether that guard was acting with reasonable care in preventing the harm incurred. (at 1372).
Further, the court indicated that expert testimony could establish what might constitute a breach of duty.
The trier of fact in the instant case found that the defendant was negligent in failing to provide adequate security, in that:
Reasonable security requires continuous, random patrolling of all areas, including parking lot A.
In support of this conclusion, he referred to the evidence summarized above on the issue of causation, including the fact that the parking lot was not fenced or otherwise secured.
Our review of those same facts discloses no manifest error in this finding of negligence. We particularly note that not only did security not see the assailant for several hours, but when Ms. Causey revealed the presence of this suspicious person to security, nothing more was apparently undertaken than a cursory walk through the lot. And this notwithstanding that it was still dark and there was a fog further obscuring visibility. We therefore decline to set aside the finding of negligence made by the trier of fact.
Defendant finally urges that the damages awarded were excessive. The award of $273,000 for medical expenses and past and future earnings is not seriously contested, but it is rather the general damages award of which AOMF complains. Those general damages were fixed as follows:

1. (Wrist)
 Physical and Mental Pain and
 Suffering,
 Past, Present and Future; Permanent
 Deformity ............................ $ 75,000
2. (Dental)
 Physical and Mental, Pain and
 Suffering,
 Past, Present and Future; Permanent
 Injuries................................ $ 75,000
3. Physical Pain and Suffering,
 Past, Present and Future (not
 wrist or dental) ..................... $ 60,000
4. Mental Pain and Suffering,
 Past, Present and Future (not
 wrist or dental)...................... $250,000
 ________
TOTAL...................................... $460,000

It has long been the law that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion, Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). Further, "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive or insufficient", Reck v. Stevens, 373 So.2d 498, 501 (La.1979) (citations omitted).
Our review of the facts of this case does not disclose any articulable reasons why the general damage award is an abuse of the trial judge's discretion. Although we find the award to be on the high side, it is *180 nonetheless not so high as to be excessive. We note also that the trial judge gave considerable weight in his reasons for judgment to the severity of plaintiff's continuing psychological injury as follows:
The intense fear of that day [of the attack] has permanently damaged her mentally and this mental deformation has affected her whole life. To put a monetary figure on this psychological damage is difficult to do. There is substantial permanent damage, therefore the award should be substantial.
The evidence supports the above findings of the severity of the psychological trauma, and considering all of plaintiff's other injuries, we are simply unable to find that the total general damage award of $460,000 is an abuse of discretion.
We finally note that plaintiff answered this appeal and urges that the trial court erred in using a work-life expectancy for her of 60.7 years, rather than of 65 years, her anticipated age of retirement. We disagree. The 60.7 years work-life expectancy was in fact a figure provided to the court by plaintiff's own economics expert, upon whom the trial judge explicitly relied in fixing the award for lost future wages. We therefore must reject this argument.
For the foregoing reasons, we hereby affirm the judgment of the district court.
AFFIRMED.