627 So.2d 688 (1993)
Robert DYE, Robert Dye, II, and Lowell Dye
v.
SCHWEGMANN BROTHERS GIANT SUPERMARKETS, INC.
No. 91-CA-1456.
Court of Appeal of Louisiana, Fourth Circuit.
November 19, 1993.
*689 Jerald N. Andry, Gilbert V. Andry, III, Andry & Andry, New Orleans, for Robert Dye, Robert Dye, II and Lowell Dye.
Wayne J. Lee, Kyle D. Schonekas, Mary L. Dumestre, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for Schwegmann Bros. Giant SuperMarkets, Inc.
KLEES, BYRNES, CIACCIO, WARD and LANDRIEU, JJ.
*690 WARD, Judge.
Robert Dye and his two sons sued Schwegmann Giant Super Markets, Inc., claiming damages from Schwegmann for the death of Mrs. Delores Dye, his wife and their mother. Mrs. Dye was murdered in Schwegmann's parking lot during an armed robbery, and plaintiffs' claim Schwegmann is liable because (1) Schwegmann breached a duty to warn of unreasonable dangers of criminal activity on Schwegmann's parking lot, (2) Schwegmann breached a general duty to protect customers from criminal acts of others, and (3) Schwegmann's security employees were negligent. These claims raise two possibilities of Schwegmann's liability: Schwegmann may be directly liable for its own negligence under La.C.C. art. 2315; either by failure to warn or by failure to protect, and Schwegmann may be liable by virtue of La. C.C. art. 2320 for the negligent acts of its employees, under the principle of respondeat superior.
This Court in Dye v. Schwegmann Giant Supermarkets, Inc., 599 So.2d 412 (La.App. 4 Cir.1992), affirmed by a two to one vote the jury verdict finding that Schwegmann was not negligent nor liable. The majority found that the trial court's instructions were wrong, but also found that the error represented a small part of a lengthy instruction which did not mislead the jury to such an extent as to prevent it from doing justice. Citing Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir. 1983). Dye, supra, at 416. The Supreme Court, believing a manifest error standard was erroneously used, reversed that judgment and remanded to this court "to make an independent determination of the facts from the record without according any weight whatsoever to the factual findings of the erroneously instructed jury. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975)." Dye v. Schwegmann, 607 So.2d 564 (La.1992).
After remand, a three judge panel could not agree and a five judge panel was convened to decide the case, and its members differ as to what facts have been proven. For the most part, however, there is general agreement on the following:
On the afternoon of September 20, 1984 Mrs. Delores Dye went shopping at the Schwegmann Giant Super Market Gentilly store in eastern New Orleans. Mrs. Dye was a frequent customer, having shopped at the store for many years. Between 2:15 and 2:30 p.m. Mrs. Dye left the store carrying groceries to her car which was parked in the parking lot in front of the store. That parking lot is a five acre tract of pavement and it is situated between Old Gentilly Road, which runs in front of and adjacent to the store, and Chef Menteur Highway, which runs in front of but marks the outer limits of the parking lot. Mrs. Dye was shot and killed by a lone gunman when she resisted his efforts to rob her in the parking lot. Her killer, Curtis Kyles, was later apprehended, convicted of the murder, and now awaits execution. See State v. Kyles, 513 So.2d 265 (La.1987), cert. denied, 486 U.S. 1027, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988).
That decision summarizes other relevant facts.
The mid-afternoon armed robbery and murder of a sixty-year old woman in the parking lot of Schwegmann Brothers' Supermarket was witnessed by four persons. The witnesses saw a black man accost the woman as she placed her groceries in the trunk of a red Ford LTD. The victim threw her purse into the trunk, slammed the lid, and tried to get away. The assailant chased her and wrestled her to the ground. When she attempted to escape again, the robber grabbed her arm, drew a revolver from his waistband, and fired it into her left temple, killing her instantly. The gunman then took her keys from her hand, got into her car, and drove slowly from the parking lot. State v. Kyles, supra, at 267
Most of the factual dispute centers on differing interpretations of testimony of Schwegmann's security supervisors and guards who were on duty at the time, and this will be considered when Plaintiffs' allegations of negligence are discussed.
Plaintiffs rely most heavily on claims that Schwegmann itself was negligent and liable under C.C. art. 2315, alleging Schwegmann breached a duty to warn customers of potential criminal acts that may cause them harm *691 while on the premises; and that Schwegmann breached a general duty to protect its customers from criminal acts of third party tortfeasors. Plaintiffs' petition, Art. VI.
First, we will consider what we believe is the least persuasive of Plaintiff's argument, a "duty to warn." Mr. Dye and his children contend that Schwegmann, when operating in a high crime area, should warn potential customers of possible criminal occurrences. This duty to warn, they argue, arises because Schwegmann's parking lot presents an unreasonable risk of harm to shoppers from criminal acts on the premises. The nature of the warning is not suggested, but presumably, it would have to be specific to have effect; that is, it would not be sufficient to warn customers that there is some criminal activity in the area. All would agree that these warnings would go unheeded. To be effective, such warnings would have to warn customers that they should protect themselves against the possibility of robbery, mugging, assaults, kidnappings, rape, or murder in a Schwegmann parking lot, day or night. If there exists a duty to warn in such a manner, there would be no customers to warn.
While it is true that a "landowner has a duty to discover any unreasonably dangerous conditions on the premises and to either correct the conditions or warn of the danger, Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406 (La.1976), that duty refers to existing dangerous conditions, meaning physical conditions which exist on the premises and are unknown to the person who ventures on the land. That rule has never been applied to create a duty to warn of danger from criminal acts that may be committed by third parties who come onto the premises. We do not interpret "conditions" to mean intangible dangers of third party criminal conduct that may happen in the future. Nor do we believe that the dangers of crime everywhere in New Orleans need special warnings to customers of grocers about parking lots, a matter well within the knowledge of any resident. We decline to hold that a grocer owes a duty to warn potential customers that they may be the victim of a crime while on the business premises.
Although Plaintiffs claim Schwegmann breached a duty to warn, their main contention is that Schwegmann is liable under La. C.C. art. 2315 for its own acts of negligencedeficient management policies and practices for security in the parking lot. These claims are stated in Plaintiffs' petition, paragraph VI, b through f. They allege Schwegmann breached a duty (b) to provide adequate security, (c) hire security guards with professional training, (d) to properly train the guards it hires, (e) post armed guards in the parking lot, (f) provide adequate security in the parking lot, (f) other unnamed acts of negligence.
In other words, Plaintiffs contend that Schwegmann breached a duty to protect customers from third party criminal acts. Whether a duty exists is generally a question of law, which courts decide by consideration of various factors.
Plaintiffs rely on Banks v. Hyatt Corp., 722 F.2d 214 (5th Cir.1984) as support for the rule that businesses have a duty to protect its customers. In that case the Court considered the duty of an innkeeper, traditionally a business that owes a great duty to guests who, as the Court pointed out, have historically entrusted their welfare to their host. The Bank's court recognized the difference, and acknowledged there was "a duty of care higher than ordinary or reasonable care" on innkeepers. A grocer, however, is not analogous to an innkeeper either in his service to customers or in his customers' expectations of safety. (722 F.2d at 226). Patrons of a grocery do not place their welfare in the hands of a grocer as a guest places his trust in a hotel, his host. Thus, hotels may well have a duty to protect under all circumstances, but Banks does not support Plaintiffs' argument that a grocer owes a duty.
Plaintiffs also erroneously rely on Harris v. Pizza Hut, 455 So.2d 1364 (La.1984) for the same proposition. Although the majority opinion in Harris cites cases from other jurisdictions when speaking of the issue of a duty to protect, the majority does not hold that such a duty exists. As a matter of fact the majority in footnote 16 says that issue is *692 left for another time, emphasizing that it did not have to consider whether Pizza Hut owed a duty to protect, because Pizza Hut had assumed that duty. In other words Harris considered Pizza Hut's liability under a respondeat superior doctrine of liability for the negligent acts of its security guard; and, as the concurring opinion emphasized, this was a case of ordinary negligence. It is not a definitive statement that restaurants owe a duty to provide protection to their customers from third party criminal acts.
Plaintiffs also rely on Willie v. American Casualty Co., 547 So.2d 1075 (La.App. 1 Cir. 1989) remanded on other grounds, 553 So.2d 467 (La.1989), and Hanewinckel v. St. Paul's Property & Liability Insurance Co., et al., 611 So.2d 174 (La.App. 5th Cir.1992). Willie lends support to Plaintiffs. In Willie the Court of Appeal upheld trial court instructions which said a shopping center's duty to maintain the premises in a reasonably safe condition "includes an obligation to protect patrons from criminal acts by third persons if such criminal acts under the circumstances prevailing are reasonably foreseeable." While the Appellate Court considered a shopping center's duty in that case, and indicated that the type of businesses and other factors determine if there was a duty to warn or protect, there is no substantial difference here where the grocery is as large as a shopping center and sells as many varieties of goods. The First Circuit Court of Appeal also held that the jury finding was not manifestly erroneous when it found breach of that duty, presumably by not providing sufficient security or proper lighting for the parking lot.
Plaintiffs, however, erroneously rely on Hanewinckel. In Hanewinckel the Appellate Court denied it was considering "novel legal principles concerning strict liability of business for the criminal acts of third persons,..., and said `it is simply a suit for negligence involving essential facts almost identical to those presented in Harris v. Pizza Hut' ..." In Hanewinckel there was evidence that Ochsner had received information that a particularly described suspicious person was on the premises at 4:30 A.M., something quite different from our facts, and the Fifth Circuit Court of Appeals simply affirmed the trial court finding that security guards of the Alton Ochsner Medical Foundation were negligent by not taking action based on that information.
We decline to follow Willie in so far as it may hold that a grocer has a duty to protect shoppers from inarticulated criminal conduct that may be committed by unnamed and unknowable third persons at some indefinite and unknown time in the future. While it is true that courts have recognized a duty to protect even under these circumstances, this duty has been placed only on those businesses which have a unique relationship to customers-hotels to their guests, hospitals to their patients, common carriers to their customers. In these situations the guests, patients, and customers have placed their safety in the hands of hotels, hospitals, and common carriers who in turn have assumed the responsibility for their welfare. But generally, businesses have never been held to be the insurer of the safety of their customers from third party criminal acts. Coblentz v. North Peters Parking, Inc., 533 So.2d 98 (La.App. 4th Cir.1988).
Plaintiffs' argue this court should follow Willie and urge this court to place such a duty to protect on certain businesses based on its size, or its nature, or its location and past criminal activity on the premises. This suggestion, even if fair, just and economically feasible, merely adds uncertainty to all businesses. As an example, when does a business become large enough? And what types of businesses should owe such a duty? A grocery but not a restaurant? A restaurant but not a shoe store? And what locations require security? Like most urban centers, all of New Orleans knows crime, and to attempt to distinguish one area as a high crime area and another as "safe" is a dubious undertaking. We believe the general rule is applicable to grocers: A business establishment is not the insurer of the welfare of its patrons. Coblentz, supra. Therefore, in the absence of any other factors, we decline to hold that a grocer owes a general duty to protect its customers from third party criminal acts.
*693 Moreover, the Supreme Court emphasized in Harris that the duty of Pizza Hut was to provide "a reasonably safe place to purchase and consume food", Id. p. 1375, and Pizza Hut was liable under ordinary, general negligence laws, not under novel ideas of strict liability of a business for third part criminal acts that harm its customers. We do not find Schwegmann breached its duty to provide a reasonable safe place to purchase and consume food. The following factors show it did not.
Much of the trial testimony came from and focused upon Schwegmann's security staff and their performance. The plaintiffs produced New Orleans Police Department records and Schwegmann's in-house reports showing the number and types of crimes occurring in the store's parking lots. The data showed that during the period of January 1, 1977 through the date of Mrs. Dye's death, 57 armed robberies were committed on the Schwegmann premises. In the two-year period alone preceding Mrs. Dye's death, there had been 22 armed robberies at the store. Plaintiffs strenuously argued at trial and on appeal that the crimes occurring in the area were of sufficient number and of such alarming violence as to place Schwegmann on notice that Mrs. Dye's death was foreseeable and to take proper precautions against it.
Schwegmann showed that it employed in-house security force and trained all of its security personnel at that store. The force consisted of a Director of Safety who was responsible for security operations for the entire Schwegmann chain and a Supervisor of Security, whose primary responsibility was the training and supervision of the uniformed guards at the stores. Additionally, Schwegmann's Gentilly store, just as the other Schwegmann stores, had its own security chief who was directly responsible for security operations.
The security program included both inside security personnel and outside guards. The outside guards wore uniforms, did not carry arms or radios, and were assigned to patrol the exterior areas of the store, including the parking lots on foot and by motor scooter. The inside security personnel included plainclothes officers and uniformed safety officers. The plainclothes personnel as well as the safety officers were required to make periodic checks of the exterior areas to verify that the outside security guards were patrolling as directed, and the interior personnel served as backup for outside security. The Director of Safety, Supervisor of Security, and the Security Chief also made periodic outside checks.
Santo Vindigni, Chief of Security at the Gentilly store, testified that he had been employed by Schwegmann since 1973 and received his certification as an auxiliary police officer in 1972. He stated that a normal compliment of outside guards ranged from a minimum of four to a maximum of eight. Included in this number was at least one guard patrolling the parking lot in a motorized scooter. At the time of this murder Schwegmann's security supervisors had assigned four personnel to act as outside guards. However, one of those guards, Terry Thomas, was in the security office filing a report describing a crime that had just occurred and another guard, Fred Moore, had not yet come on duty, although he was in the store, preparing to go outside after he received final instructions. Everett Mosely was on patrol in the parking lot as was Miriam Lewis on the scooter. One other guard, who normally would have been on duty that day, was transferred to another store to fill an illness vacancy.
Lawrence Williams, a 17-year Schwegmann employee, head of uniformed security for the entire chain since 1984 and the person responsible for hiring and training uniformed guards, testified that he had served as a military policeman in the armed services. He later received his college degree in safety engineering in 1982. He continued his education in security by attending seminars and taking classes at local vo-tech schools while working for Schwegmann. He explained that uniformed security officers were briefed on company policies and applicable criminal statutes as well as their duties and responsibilities in patrolling the parking lots. There was continuing instruction and periodic written testing to gauge the security officers' understanding and retention of store *694 policies. Weekly safety meetings were held in which incident reports or records of any "happenings" on the premises, were reviewed in an attempt to better station or position personnel to counter problems in the parking lots. The guards were instructed to move constantly, patrol in a random fashion so that prospective perpetrators could not predict where the officers would turn next and to investigate any suspicious activity in the lots.
Both Vindigni and Williams testified they were inside the store at the time of the shooting. Terry Thomas, Everett Mosely, Miriam Lewis and Fred Moore all testified, basically verifying previous testimony concerning training procedures, job duties and descriptions of the security hierarchy. Further, Thomas and Moore confirmed that they were in the store at the time of the shooting; while Mosely pinpointed his location in the west side of the parking lot, "not far from" the site of the murder.
Miriam Lewis told the Court she was operating the scooter during the time of the armed robbery and murder and that she had in fact passed the area of the shooting only minutes before and did not notice any suspicious people in the area. Plaintiffs argue that the security personnel were negligent by being absent from the area, but the record does not support those arguments. Rather, it shows that Ms. Lewis drove the scooter to the front of the store to take a break and deliver the scooter to the person relieving her, Fred Moore. To insure alert effective security, the guards changed shifts and took breaks. It was unfortunate that during the necessary changing of the personnel, the shooting occurred, but there was not a breach of Schwegmann's duty to provide a reasonably safe place to shop.
Although Schwegmann may not be liable for breach of a duty to warn or to protect, Schwegmann may be liable under general negligence law for the negligent acts of its employees, through respondeat superior, La. C.C. art. 2320. This argument was not fully considered in the trial court because Plaintiffs did not allege it. See Plaintiffs' petition, VI(a) through (f). (f.n. 1). In this court however, Plaintiffs now argue general negligence, that is, they contend that once Schwegmann assumed the duty to protect it must do so without negligence, meaning that Schwegmann is liable for negligent acts of its employees in performing their assumed duty to protect Mrs. Dye. Plaintiffs once again rely on Harris, supra., this time correctly, because Harris supports Plaintiffs' general proposition that a duty once assumed must be carried out prudentlywithout negligence. Therefore the question we now consider is whether Schwegmann's employees acted negligently while providing security, and if so, is Schwegmann liable under a duty risk analysis.
Even when considering vague allegations raised in argument of employee negligence, the first question is whether those alleged acts of negligence meet the cause-in-fact test. Did the negligence of Schwegmann's security guards cause the death of Mrs. Dye? We find that Plaintiffs have not proven that it is more probable than not that if the security guards had acted differently this would have prevented the murder of Mrs. Dye.
Plaintiffs' experts agreed with defense expertsthe primary purpose of a security guard is deterrence of crime by a visible presence. Security guards are not policemen. They cannot prevent all harm, nor can they physically keep potential criminals away from the premises.
Willie Jones, who was employed by Norco Construction Company and who was helping remove gasoline storage tanks on the parking lot, was close to the scene. He testified that he saw a Schwegmann security guard in this area four or five minutes before Mrs. Dye opened the trunk of her car. That guard was driving a motor scooter and passed the row of cars where Mrs. Dye's car was parked, turned and headed up another aisle in the direction of the store, to where Schwegmann's tire and battery shop is located. Jones testified that the guard passed Mrs. Dye's car just moments before Kyles committed the brutal murder. Tr. Vol. III at pp. 11-13. His testimony is credible and persuasive. He stated that he was working near Chef Menteur Highway when he observed the robbery 50 to 60 feet away. He *695 further said guards had passed the area at 15 minute intervals that day.
Considering Jones's testimony, it is unlikely that more security guards would have deterred a determined criminal like Curtis Kyles from the robbery and ultimately from the murder. Plaintiffs discount this testimony, but he was Plaintiff's witness, and they relied on Jones's testimony to establish other facts. Thus we do not find that cause-in-fact was proven by a preponderance of the evidence.
Even if cause in fact is assumed, the above facts show that there was not a breach of duty. In an effort to deter criminal activity, Schwegmann's security force was highly and regularly visible in these parking lots. It would be impractical to employ a security force so large that every aisle would be insured of safety at every moment. Based on testimony by the Schwegmann personnel, and by the independent eyewitness, it is clear that Schwegmann performed the assumed duty of providing security with due care. At 2:20 p.m., in the middle of the afternoon, in broad daylight, a calculating criminal took advantage of the time he had between the passing of the security guard patrols to commit a robbery, which resulted in a murder. Security cannot protect from every crime, and the performance of a duty with due care will not protect from this type of crime in every case. Our review of the facts lead us to conclude that Schwegmann discharged its duty in a reasonable manner calculated to protect its patrons from criminal assault.
Judgement is hereby rendered in favor of the defendant, Schwegmann Giant Super Markets, Inc. and against Robert Dye, Robert Dye, II, and Lowell Dye, dismissing all claims.
BYRNES, J., concurs with WARD, J.
LANDRIEU, J., concurs with reasons.
KLEES and CIACCIO, JJ., dissent.
BYRNES, Judge, concurring with WARD, Judge.
I concur with the very well reasoned opinion of Judge Ward. Mrs. Dye was the tragic victim of criminal violence. In the absence of a clear, specific constitutional or legislative mandate prescribing the outcome of this case, this Court should consider how its decision will affect the likelihood of a recurrence of such tragedies in the future as well as its broader impact upon society.
The police and the government of this city who are mandated to deal with the problem of crime haven't solved the problem. Therefore, to hold merchants like Schwegmann liable under these facts hardly seems reasonable, and might represent a dubious step in the direction of judicially encouraged vigilantism.
Schwegmann is one of a dwindling number of merchants who continue to serve inner city and minority neighborhoods with high quality competitively priced goods. Other merchants feel compelled to charge premium prices from those in our community least able to afford them in order to compensate for the greater risk and overhead, while many more have simply fled, taking their goods and services and more significantly, their jobs with them. This just creates a spiral of poverty, unemployment, despair and crime. This is why the residents of poor inner-city, minority neighborhoods have to travel the farthest and pay more for goods and services that are often of poorer quality.
If merchants are held responsible for random crime they will be forced to move out of high crime areas. It is the equivalent of imposing a tax or penalty on merchants in high crime areas. Their liability insurance rates would skyrocket, or if they can't obtain such insurance, their self-insurance exposure would become intolerable. The adverse effect on those merchants who, along with their employees, try to persevere under difficult circumstances to bring goods, services and employment and the message of hope that goes with them to the under-served, abandoned, forgotten, minority neighborhoods of this city would be significant. The long range effect would fall disproportionately and disastrously on the low income, minority neighborhoods they would be forced to abandon.
Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984) does not apply to *696 these facts. In the Pizza Hut case the security guard precipitated a shoot-out in a fast food outlet resulting in the death of one patron and the severe wounding of another. There is a big difference between a security guard who creates a violent confrontation and one who merely fails to prevent a random act of violence from occurring. The Pizza Hut case should be limited to its own peculiar facts. There is also a big difference between knowledge that crime is a general problem and advance knowledge of a specific crime.
The court in Pizza Hut said that a merchant has no duty to provide security guards, but once that merchant voluntarily elects to assume that duty, the duty must be discharged without negligence. The court in Pizza Hut meant that the security guards could not act negligently in such a manner as to actually increase the risk of harm to customers above the level of risk that would exist if there were no security guards. The court in Pizza Hut could not have intended to penalize a merchant with an inattentive security guard more than a merchant with no security guards. Such a penalty would discourage the use of security guards which is not in the best interests of those this Court is trying to protect. As Judge Ward noted, even the plaintiffs' experts agree that "the primary purpose of a security guard is deterrence of crime by a visible presence of guards." (Emphasis added.) Even an inattentive security guard is a better deterrent than no security guard.
Therefore, even though I agree with Judge Ward that the plaintiffs' failed to prove the negligence they alleged, I would feel the same way if the plaintiffs' had succeeded in proving that negligence because plaintiff failed to show that inattentive security guards would have created a greater hazard than if Schwegmann had had none.
To compare crime to a physical defect in the premises is a false analogy. A merchant is responsible for the condition of his premises. It is not a governmental responsibility law and order is. If a liability law encourages a merchant to correct a physical defect that could cause injury, the problem is solved and the public policy objective is achieved.
Although there are no legislative enactments specifying liability under the facts of this case, there are numerous city, state, and national initiatives expressing a strong local, state and national policy of providing incentives to cause economic movement into and revitalization of low-income, minority areas, none of which can succeed if merchants do not remain in and return to those areas. One need only refer to the Community Reinvestment Act which pressures financial institutions across the nation to make services and funds available to low-income, minority areas to know that public policy clearly favors actions that encourage economic movement into rather than out of these areas.
Survival is such a full time job and despair is so overwhelming for most poor, minority residents of this jurisdiction that they do not have the time, energy or resources to make their voices heard on such issues. The vast majority of these people are decent, law abiding citizens who in addition to struggling with the heavy burdens of poverty and unemployment, are themselves disproportionately victims of crime. If they could, they would surely beg us not to drive out what few goods, services and jobs remain. This Court should not compound their burdens by contributing to the further erosion of the economic base of their neighborhoods, which will only result in more crime and violence, not less.
LANDRIEU, Judge, concurring with reasons.
Because this matter has been remanded by the Supreme Court to be decided by us on the record made below without regard to the jury verdict, we find ourselves in the position of fact finders, as well as interpreters of the law.
As a fact finder, I conclude that the sole cause in fact of defendant's death was the willful, random, violent act of Curtis Kyles, her attacker. There has been no showing that any act or omission of Schwegmann encouraged, precipitated, invited, permitted or allowed this crime to happen. Nor is there any evidence that Schwegmann's parking lot is constructed in such a way that it *697 encouraged the crime because of lack of visibility. The lot is not walled or covered and is totally opened to public view. It is surrounded by well travelled streets and is not isolated.
As an interpreter of the law, I find no legal duty imposed on Schwegmann to protect its customers from unforeseeable random crime. There is no evidence that Schwegmann advertised the safety of its premises or lured customers there with promises of safety. Nor is there any evidence that Mrs. Dye shopped at Schwegmann because of the presence of the security personnel. It would be misguided legal policy to impose such a duty on a business which is operating in compliance with governmental land use, zoning and building regulations, particularly, where businesses have been encouraged by City, State and Federal policies and programs to remain in the inner city where the rate of poverty, joblessness and crime is high.
Although the dicta in Harris v. Pizza Hut, 455 So.2d 1364 (La.1984) suggest that a duty to protect may be assumed, it is incorrect to hold that Schwegmann assumed the legal duty to protect its customers from random, violent crime, merely because it voluntarily adopted a security plan and employed security personnel. Such a rule would penalize those businesses which show concern for the well being of their customers while effectively rewarding those which do not.
Here, Schwegmann assumed the duty of providing protection which it was not legally required to do. That assumed duty was not owed to Mrs. Dye and did not rise to a legal duty because plaintiff did not prove that Mrs. Dye relied on the presence of the gratuitous security. A merchant should not be held liable for a breach of legal duty because of the mere absence of protection which was not owed in the first place.
If, in fact, Schwegmann did assume a legal duty to provide protection to its customers from third party, random violence, I would find, as a fact finder, that Schwegmann did not breach that duty to Mrs. Dye for the reasons stated by Judge Ward.
This was a tragic incident and one cannot but feel empathy for Mrs. Dye and the plaintiffs. But, under the facts of this case, Schwegmann, in providing an essential and necessary retail service in a high crime area in conformity with law and public policy, should not be held liable for an unforeseeable, random crime that just as readily could have happened on the streets or sidewalks near its premises or at some other location, commercial or residential, elsewhere in the City.
KLEES, Judge, dissenting.
I respectfully dissent.
Under the circumstances of this case, I would hold that Schwegmann breached its duty to the plaintiff to provide reasonable protection against the risk of third party criminal attacks in its parking lot. Because Schwegmann had voluntarily assumed the duty of providing security to its patrons, the issue is whether this duty was performed with due care. See Harris v. Pizza Hut, 455 So.2d 1364, 1369 (La.1984). I find that it was not so performed.
The plaintiff was assaulted and killed in Schwegmann's "main" parking lot, which encompasses approximately five acres on the north side of the store. At the time this assault occurred, 2:20 p.m. in the afternoon, there was not a single Schwegmann security guard in the main parking lot. The majority glosses over this crucial fact by stating that security guard Miriam Lewis was operating the scooter "during the pertinent time frame," and had passed the area of the shooting "only minutes before". The actual facts show that sometime between 2:00 p.m. and 2:15 p.m., Miriam Lewis parked the scooter in front of the store and went inside to take an admittedly unauthorized break before her relief, Fred Moore, came on duty at 2:30 p.m. Fred Moore testified that when his wife dropped him off for work between 2:00 and 2:15 p.m., the security scooter was parked in front of the store. When the shooting occurred, he was inside waiting to punch in at 2:30 p.m. Another outside guard, Terry Thomas, was inside the store filling out a report. A fourth outside guard had been sent that morning to fill a vacancy at another Schwegmann store. The only remaining outside guard, Everett Mosley, was on patrol in *698 the "new" parking lot, which consisted of more than three acres on the west side of the store. He neither saw nor heard the shooting. The actual facts concerning the size and location of the two parking lots call into question Mosley's testimony, quoted by the majority, that he was "not far from" the site of the murder.
There was inconsistent testimony from Schwegmann employees concerning the usual deployment of outside security guards at this particular store. Santo Vindigni, the security chief for this store at the time of the murder, stated that he normally used at least four outside guards to patrol the main parking lot. This testimony was corroborated by two outside guards, Fred Moore and Miriam Lewis, while a third guard (Richard Jackson, Jr.) said the store usually had three guards patrolling the main lot. Lawrence Williams, the supervisor of all uniformed security guards for all Schwegmann stores, testified that the security plan consisted of three guards for the entire outside of the store, two on foot and one on the scooter. Michel Laureys, Schwegmann's corporate security director, and Gail Williams, an inside security guard, both indicated that the minimum number of guards for the entire outside of the store was two. Despite the inconsistencies in the testimony, however, it is clear that even the lowest minimum standard cited by any of the witnesseswhich was two guards outside the storewas violated in the instant case. At the time of plaintiff's murder, there was only one security guard outside the storeEverett Mosley, who was in the west (or "new") parking lot. Moreover, the reason there was not another guard on patrol is that the other assigned guard was taking an unauthorized break inside the store, which left no one watching the main parking lot. Under the circumstances, I would hold Schwegmann liable for the negligent breach of the duty it assumed to protect its patrons from the risk of criminal assaults. See Harris v. Pizza Hut, supra, at 1371.
I also believe that the majority's statement that Louisiana law does not impose a duty upon grocers to protect their customers from the criminal acts of third parties is overly broad. Certainly, the proprietor of any business has a duty to take some precautions or provide some measure of security to its customers when the criminal activities are reasonably foreseeable. See Phillips v. Equitable Life Assurance Co., 413 So.2d 696 (La. App. 4th Cir.1982). In Harris v. Pizza Hut, supra, the Supreme Court noted that "any business which invites the company of the public must take reasonably necessary acts to guard against the predictable risk of assaults." 455 So.2d at 1369. Given the circumstances of the instant case (a physically large grocery store, part of a large profitable chain, located in an admittedly high crime area, with numerous prior crimes having occurred in the parking lot), I do not believe that any Louisiana court would have found that Schwegmann had no legal duty to provide security to its customers had it not done so voluntarily. Essentially, to determine whether Schwegmann discharged its "assumed" duty in a reasonable manner is no different from determining whether Schwegmann fulfilled its legal duty to protect its customers from foreseeable dangers. The "assumed duty" principle is merely a smokescreen which relieves the court from having to define the parameters of the legal duty of a business owner to protect against the risk of crimes perpetrated on patrons. In my view, the scope of the duty should be determined in individual cases by considering such factors as the nature and location of the business, the physical condition of the premises, and the past experience of the business with regard to prior crimes. See, e.g.: Willie v. American Casualty Co., 547 So.2d 1075, 1076 (La.App. 1st Cir.1989).
CIACCIO, Judge, dissenting.
I respectfully dissent.
I join in the dissent of Judge Klees and offer additional reasons.
In Mundy v. Department of Health & Human Resources, 620 So.2d 811 (La.1993) the Supreme Court cited, with approval, the Restatement (Second) of Torts, Sec. 344 comment (f) 1965:
If the place or character of his business, or his past experience, is such that he [the proprietor] should reasonably anticipate careless or criminal conduct on the part of *699 third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.
I find that Schwegmann had a duty to take precautions against criminal conduct on the part of third persons because their past experience of many armed robberies on their parking lot caused them to reasonably anticipate that other armed robberies were likely to take place.
The Schwegmann parking lot was unusually dangerous. It was extremely large, surrounded on three sides by public streets, one of which separated the parking lot from the supermarket building. Pedestrians had unrestricted access from at least three sides of the lot. The parking lot was near a high crime area and the number of criminal incidents, including armed robberies, that had been perpetrated in preceding years had to alert Schwegmann to the high degree of risk of harm faced by its patrons.
To its credit, Schwegmann recognized its duty, assumed its responsibility, and devised a security plan to provide a reasonably sufficient number of security guards to afford reasonable protection to its customers.
However, I find that Schwegmann was negligent in failing to have procedures in place to prevent a breakdown in the security measures that Schwegmann had found to be necessary and appropriate for the protection of its patrons.
The record shows that one of the guards was sent to another store, the guard on the scooter had temporarily left her post and the only other guard was not patrolling the large parking lot. Thus, at the time of Mrs. Dye's murder, there were no security personnel on the large lot.
I find that Schwegmann breached its duty to provide a reasonably sufficient number of servants (security guards) to afford a reasonable protection to Mrs. Dye, that the breakdown in security had a causal connection with the perpetration of the armed robbery, thus making Schwegmann liable, as a joint tort-feasor, for her death.